DA 07-0443

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 126

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

RICHARD LEE CROSLEY,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC-99-79
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Jim Wheelis, Chief Appellate Defender; Tammy Hinderman,
Legal Intern, Helena, Montana

      For Appellee:

            Hon. Steve Bullock, Montana Attorney General; Tammy Plubell,
Assistant Attorney General, Helena, Montana

            George H. Corn, Ravalli County Attorney; William Fulbright,
Deputy County Attorney, Hamilton, Montana

            Submitted on Briefs: February 11, 2009

                  Decided: April 14, 2009

Filed:

           _____
                  Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    Richard Lee Crosley (Crosley) appeals his conviction in the Twenty-First Judicial District Court, Ravalli County, of seven counts of incest, three counts of assault on a minor, and bail jumping. We affirm in part, vacate in part, and remand for re-sentencing.

¶2    We restate the issues on appeal as follows:

¶3    Whether the District Court abused its discretion when it denied Crosley's challenge for cause of potential juror H.J. Aronson (Aronson).

¶4    Whether the District Court properly admitted evidence of other acts of incest outside of Ravalli County under the transaction rule.

¶5    Whether Crosley was denied effective assistance of counsel.

¶6    Whether the District Court erred in sentencing Crosley pursuant to the law in effect at the time of sentencing rather than at the time of the offenses.

**BACKGROUND**

¶7    The evidence at trial indicated that Crosley abused his three oldest children from 1990 to 1998, while the family frequently moved residences, generally living in Ravalli County, Montana. Daughters, A.P. and J.P., were born in 1986 and 1988, and son, R.J., was born in 1991. Crosley was not charged with abusing his youngest daughters, R.P. and H.P., born in 1994 and 1997. Crosley's ex-wife, E.P., provided a chronology of where the family lived during this time. Crosley's children testified at trial about his escalating abuse, using the family's frequent moves and births of additional children to

frame particular recollections of abuse. The charges against Crosley were similarly broken down by timeframes corresponding to residences where the abuse occurred.

¶8 A.P. testified that Crosley began sexually abusing her when she was approximately four. Initially the abuse consisted of fondling and oral sex. When A.P. was six or seven, the abuse escalated to sexual intercourse, and by the time she was nine, the abuse included anal sex. A.P. testified that the abuse continued until she disclosed it in 1998 when she was 12. After A.P.'s disclosure, J.P. recalled her father had touched her inappropriately as well. J.P. remembered fondling, but did not recall any instances of sexual intercourse or oral sex. A.P. testified that Crosley was the main disciplinarian in their house, and the primary form of discipline was spanking. Crosley initially spanked the children with his hands, but began using wooden spoons and an electrical cord as the children got older. Crosley hit both R.J. and J.P. with the plug end of a cord, sometimes on their bare skin. The children testified that Crosley shoved them, kicked them, and hung them upside down by their ankles. A.P. also testified that Crosley used pliers to twist her fingers until they cracked.

¶9 Crosley's sexual abuse of A.P. started while the family lived in an apartment on Second Street in Corvallis, Montana. A.P. recounted that while she was playing dress up and pretending to be a bride, Crosley gave her a little gold ring, had her repeat marriage vows, and told her she was his wife. Crosley reminded A.P. that she was his wife throughout her childhood. The first instances of sexual abuse at the Second Street apartment involved Crosley putting A.P.'s hand on his penis, Crosley touching A.P.'s genitals, and Crosley forcing A.P. to perform oral sex on him at least three times. A.P.

3

testified that the sexual contact continued when the family moved to Marcus Street in Hamilton, although her only vivid memory was Crosley teaching her how to "French kiss." The family moved to Charlos Heights where Crosley fondled A.P.'s genitals and had her stroke his penis. A.P. testified about being in the back seat of a car in the garage where Crosley forced her to perform oral sex on him. Crosley's sister-in-law, Tonya Crosley, testified that she walked into the garage on one occasion and found A.P. in the back seat of a vehicle with Crosley.

¶10 Crosley had sexual intercourse with A.P. for the first time during a trip to California at the time the family was living in the Charlos Heights house. When A.P. tried to get away, Crosley slapped her across the face and knocked her off the bed. A.P. recalled bleeding and soreness in her vaginal area for several days. She was about seven years old.

¶11 Crosley used religion and social isolation to keep his sexual abuse a secret. Crosley invoked the Bible numerous times to convince A.P. that there was nothing wrong with their sexual relationship and that she was his wife. Crosley assured A.P. that they should not tell her mother about their relationship because she did not think it was okay to have more than one wife, and she would be angry with A.P. and love her even less than she already did. Crosley convinced A.P. that her mother did not love her as much as she loved A.P.'s siblings and that only he really loved her.

¶12 The sexual abuse continued as the family moved around Montana, living outside of Ravalli County in Missoula and Ronan for several years. Crosley's sexual abuse of A.P. escalated to anal intercourse in Ronan. This caused A.P. extreme embarrassment

4

and bleeding. During this time, Crosley and A.P. often visited her paternal grandparents in Corvallis where the sexual abuse continued. A.P. testified to multiple incidents of sexual intercourse, oral sex, and genital touching in an upstairs bedroom at her grandparents' house, as well as three occasions when Crosley made her perform oral sex on him in her grandparents' barn.

¶13 While the family lived in Ronan, A.P. recalled seeing Crosley fondle J.P. and Crosley put J.P.'s hand on his penis. Crosley began allowing J.P. to watch the sexual contact between him and A.P. A.P. recounted one incident when the girls were playing dress up with strips of cloth to mimic Indian princesses and Crosley tied J.P. up with some of the strips, forcing her to watch as Crosley had sex with A.P. While J.P. did not recall ever having intercourse with Crosley, she did remember how he would fondle her under her dress while she sat in his lap.

¶14 When the family moved to Fish Hatchery Road outside of Hamilton, the sexual abuse escalated to what A.P. described as a "torture stage." There was a small room in the basement that was reached through a hole in the foundation wall where Crosley's sexual intercourse with A.P. became a "fairly regular occurrence." J.P. recounted at trial that she once found Crosley and A.P. naked on a mattress in the crawl space in the basement. Crosley also hung both A.P. and J.P. by their ankles from the ceiling in the basement. A.P. also testified that Crosley used pliers to twist her fingers until they cracked in this basement.

¶15 Crosley physically abused his children on multiple occasions. He was particularly violent to R.J. Crosley repeatedly spanked him with the plug end of a lamp cord, shoved

5

him into walls, and picked him up by the head. J.P. recounted being thrown to the ground and kicked repeatedly by Crosley once when she did not complete a task to his liking.

¶16 The family moved to the Main Street house in Corvallis where all forms of sexual abuse continued. Crosley would drive down to their church parking lot where he had A.P. sit on his lap in a skirt or dress without underwear and fondle her as she read the Book of Psalms from the Bible. A.P. invited friends to spend the night to celebrate her 12th birthday when Crosley was scheduled to be out of town. Crosley returned unexpectedly and ordered A.P. to follow him to his bedroom where he had sex with her while her guests were in the living room. J.P. remembered that A.P. emerged from the bedroom looking sad and dejected. Crosley then called J.P. into the bedroom where he put his penis in her panties.

¶17 A.P. finally disclosed Crosley's years of sexual abuse to her mother. On one prior occasion when she was about nine, her mother read her a "Good Touch, Bad Touch" book and A.P. disclosed that Crosley had "rubbed" on her. This led her mother to confront Crosley and implement some "modesty rules," however the abuse resumed. A.P. effectively disclosed Crosley's abuse after her 12th birthday, when she began hearing Crosley telling her younger sister, R.P., the same things he used to tell her, that her mother did not love her anymore because R.P. was no longer the baby of the family. After A.P.'s disclosure, E.P. initially tried to work things out with their pastor's help, however soon went to the authorities. Detective Peter Clarkson with the Ravalli County Sheriff's Office interviewed A.P. regarding the sexual abuse in 1998, and again in 2006.

6

¶18 On August 12, 1999, Crosley was charged by information with incest, involving sexual intercourse without consent with A.P. Crosley appeared with counsel and pled not guilty on August 25, 1999. Crosley was released on his own recognizance, failed to appear for his omnibus hearing, and a bench warrant was issued for his arrest on November 17, 1999. Crosley was a fugitive until his arrest in August, 2006. Following a renewed investigation, an Amended Information was filed charging Crosley with seven counts of incest. A second Amended Information was filed on December 11, 2006, charging Crosley with eight counts of incest, corresponding to time periods associated with where the abuse occurred and which child was the victim; three counts of assault on a minor, one for each child; and bail jumping.

¶19 On November 30, 2006, the State filed a Notice of Intent to Introduce Evidence of Other Crimes, Wrongs & Acts (Notice). The Notice indicated that the State would offer evidence of a "very significant trip to Sacramento, California, where Defendant first elevated his abuse from sexual assaults to sexual intercourse," in addition to evidence of sexual and physical abuse that occurred in Missoula and Lake Counties between 1993 and 1995. The State relied upon the transaction rule, § 26-1-103, MCA, and in "an abundance of caution" provided a Modified *Just* Notice under M. R. Evid. 404(b). On the first day of trial, March 5, 2007, defense counsel stated his belief that the Notice "would have met the legal standards." The judge noted that he had reviewed the Notice and "there being no objection, the notice is found to be sufficient and the State is allowed to inquire into the areas covered by that notice during the trial."

¶20    During voir dire, the prosecutor, Mr. Fulbright, questioned potential juror

Aronson:

>     MR. FULBRIGHT:  A detective with the Sheriff's Department by the name of Pete Clarkson.
>     Does anybody know Detective Clarkson or had occasion to have run in with him.
>     Okay. I've got to go to my cheat sheet here.  Mr. Aronson.
>     PROSPECTIVE JUROR:  Yes.
>     THE COURT:  Do you know Detective Clarkson?
>     PROSPECTIVE JUROR:  Yes.
>     MR. FULBRIGHT:  How do you know him?
>     PROSPECTIVE JUROR:  Just professionally.  I work for the Forest Service and he works for us.
>     MR. FULBRIGHT:  So he had a long career here, you knew that, and you had a long career with the Forest Service, it looks like.  You guys crossed path a few times?
>     PROSPECTIVE JUROR:  Yes.
>     MR. FULBRIGHT:  So the question that's really relevant is this: Detective Clarkson is going to be up here for a few minutes testifying during this trial, was involved in this case.  The question for you would be: Detective Clarkson's testimony versus other people's testimony and such, the fact that you know Detective Clarkson in whatever manner, or however little you know him, would that affect your ability to view his testimony the same as other people's testimony?
>     PROSPECTIVE JUROR:  I would give a lot of credibility to his testimony from knowing him.
>     MR. FULBRIGHT: Okay.  All right.
>     Would you be able to listen his testimony and then some other witnesses, maybe even people that disagreed with him, let's suppose that happens, someone disagrees with Detective Clarkson, and be able to set aside the fact that one of those was Detective Clarkson and one is Witness B, and say let me look at the facts and weigh those out and keep an open mind?
>     PROSPECTIVE JUROR:  Somewhat, yeah.  I'd tend to believe Mr. Clarkson, but I'd try to keep an open mind, I guess.
>     MR. FULBRIGHT:  Could you keep an open mind, look at the facts?
>     PROSPECTIVE JUROR: Uh-huh.
>     MR. FULBRIGHT:  I appreciate your candor.

¶21    Defense counsel, Mr. Eschenbacher, immediately questioned Aronson at the start

of his voir dire:

> MR. ESCHENBACHER:  Mr. Aronson, you said you know Detective Clarkson.
>
> PROSPECTIVE JUROR:  That's correct.
>
> MR. ESCHENBACHER:  And you actually value his testimony very strongly, didn't you say that?
>
> PROSPECTIVE JUROR:  Yes, I would.
>
> MR. ESCHENBACHER:  If it came down to Detective Clarkson saying A and an unknown witness saying B, who are you going to believe?
>
> PROSPECTIVE JUROR:  Probably Mr. Clarkson.
>
> MR. ESCHENBACHER:  And that's based on your knowledge of him.  He's a decent gentleman.  He's been around a long time.
>
> But based on that, if it was totally neutral what the information was but they contradicted each other, you automatically would have to follow in line with Detective Clarkson?
>
> PROSPECTIVE JUROR:  I would tend to believe him before I'd believe somebody I didn't know because I know he's a very credible man in my opinion.
>
> MR. ESCHENBACHER:  We're not attacking his credibility. We're exploring testimony it's mostly when it comes down to if Detective Clarkson said something and you're going into the jury room to deliberate and someone else had another witness had said something, do you think you would be fair to the other jurors or would you just say Pete Clarkson said it, I don't need to worry about it?
>
> PROSPECTIVE JUROR:  People can make mistakes on what they think they saw, too.  I'd consider that, of course, but I just don't think that Pete would lie on the witness stand.
>
> MR. ESCHENBACHER:  And again, I'm sorry, I don't want it misconstrued.  I'm not saying people would lie.  I'm saying maybe a difference of opinion or difference of observation.
>
> PROSPECTIVE JUROR:  Okay.
>
> MR. ESCHENBACHER:  Would that affect you, how you would look at it, that maybe Pete would look at it differently than somebody else?
>
> PROSPECTIVE JUROR:  I would look at it from what people have said.
>
> MR. ESCHENBACHER:  Okay.  But if you looked at it from what they both said, you give me the impression that you think that Detective Clarkson word would carry more weight; would that be fair?
>
> PROSPECTIVE JUROR:  Honestly, I guess I'd have to say yes.
>
> MR. ESCHENBACHER:  With that in mind, do you think you can

be absolutely fair to Richard if Detective Clarkson said something that was against Richard?

PROSPECTIVE JUROR:  It would have to depend on what it was, what he said.  If it was, I guess, an opinion versus something that —  you have to weigh opinions versus facts, too, I guess.

MR. ESCHENBACHER:  But if you had -- if it came down to that hair breath's difference, do you really think you couldn't give a fair shake to both sides, do you think you'd probably fall over on the side --

PROSPECTIVE JUROR:  I think I would probably follow Pete's lead.

MR. ESCHENBACHER:  Again, I'm not trying to pick on you, I'm just trying to make sure that we get as fair a panel as possible, and Pete Clarkson is a great guy, but if you're biased towards Pete, you may not be as fair towards Richard.

Do you understand where I'm going?

PROSPECTIVE JUROR:  Yeah, I understand.

MR. ESCHENBACHER:  Do you think you could be fair to Richard?

PROSPECTIVE JUROR:  I think so.  I guess, you know, you really don't know until you know what they're both saying.

MR. ESCHENBACHER:  But you realize you won't know what they're both saying unless you're picked for a jury.

PROSPECTIVE JUROR:  I realize that.

MR. ESCHENBACHER:  So if you're picked for a jury and you don't know until after Pete Clarkson testifies that that could be a problem for us.

PROSPECTIVE JUROR:  I would have to believe Pete, somebody I know, in all honesty.

MR. ESCHENBACHER:  Sure, sure.  Based on that in mind, do you think it would be appropriate that you sat on this jury or would you rather not, because you might be called for another jury where Pete Clarkson might not be called, it might be easier for you to be totally fair to both sides.

PROSPECTIVE JUROR:  I would guess that.  Obviously, if you don't know people, you're -- I mean there's people I know that I would tend not to believe.

MR. ESCHENBACHER:  Oh, yeah.

PROSPECTIVE JUROR:  I'd give a little more reasonable doubt, but Pete's not one of them.  And I'd try to be unbiased.

MR. ESCHENBACHER:  Would you have to work at it?

PROSPECTIVE JUROR:  We're really splitting hairs here.

MR. ESCHENBACHER:  I know.  I have a tremendous responsibility to Richard.

PROSPECTIVE JUROR: In all honesty, if Pete and somebody else that I didn't know stated two things differently, I would believe Pete. That's all can I really say.

MR. ESCHENBACHER: Would you mind if I asked the judge if you can be excused? Would that be a problem for you?

PROSPECTIVE JUROR: No, that's your prerogative.

MR. ESCHENBACHER: Your Honor, I would ask that Mr. Aronson be allowed to be excused for cause based on his giving extra weight, and fairly, I understand, but giving extra weight to a possible potential witness.

THE COURT: Question.

MR. FULBRIGHT: Your Honor, I guess I heard Mr. Aronson say he could be fair, and he recognizes he knows people but a lot of people know people in the valley here, so I think he answered that he could be fair in weighing out the testimony.

THE COURT: Well, sir, you understand that every witness is presumed to speak the truth once they're under oath, correct?

PROSPECTIVE JUROR: I understand that people are presumed to speak the truth. I don't believe that they always do when they're under oath, so I would tend to take what I know, you know, about a person and weigh that in.

THE COURT: But you would be willing to, if there was some difference in the testimony, you would be willing to consider the opposing testimony and any of the surrounding circumstances that would be consistent with one or the other?

PROSPECTIVE JUROR: I would look for consistency, yes.

THE COURT: And if you found that, having done that, that perhaps another witness's testimony is more consistent with surrounding circumstances than Officer Clarkson, you would be willing to go where that leads you?

PROSPECTIVE JUROR: I would look at that very heartily, yes.

THE COURT: And you would be willing to base any verdict on solely on the evidence as you find it and the jury instructions?

PROSPECTIVE JUROR: Correct.

THE COURT: Well, I don't believe that cause has been shown.

MR. ESCHENBACHER: Thank you, Your Honor.

¶22 Later during voir dire, defense counsel noted how incest is different than other crimes. In particular, counsel relayed how many people would ask him whether he thought a defendant charged with murder was innocent, but when he mentioned

11

representing a defendant charged with incest, people would ask, "how could he?" Defense counsel then asked the jury pool how many had that feeling, "how could he?" Counsel followed up with many jurors, including Aronson, who responded, "I think it's a horrible thing and it's very distasteful, but we have to know whether a person did it or not."

¶23 During the four-day trial, the State presented 22 witnesses. In addition to the children and their mother, witnesses included investigators, and friends and family who observed various incidents corroborating aspects of the children's testimony.

¶24 The jury found Crosley guilty of all charges except for one count of incest alleging sexual contact between Crosley and J.P. occurring sometime between 1991 and 1995. For the incest convictions, the court sentenced Crosley to six concurrent life sentences and one consecutive 50-year sentence, with 25 years suspended, all to be served without parole eligibility until he completed all available phases of sexual offender treatment. Crosley appeals.

## STANDARD OF REVIEW

¶25 This Court reviews a district court's denial of a challenge for cause to a prospective juror for abuse of discretion. *State v. Robinson*, 2008 MT 34, ¶ 7, 341 Mont. 300, 177 P.3d 488. If a district court abuses its discretion in denying a challenge for cause, the defendant uses a peremptory challenge to remove the juror, and also uses all of his peremptory challenges, we will reverse the judgment and order a new trial. *Robinson*, ¶ 7.

¶26 We review a district court's evidentiary ruling regarding the admissibility of evidence of other crimes, wrongs, or acts for abuse of discretion. *State v. Marshall*, 2007 MT 198, ¶ 11, 338 Mont. 395, 165 P.3d 1129.

¶27 Ineffective assistance of counsel claims are mixed questions of fact and law that we review de novo. *State v. Herrman*, 2003 MT 149, ¶ 18, 316 Mont. 198, 70 P.3d 738.

¶28 This Court reviews a criminal sentence for legality; we determine whether the sentence is within statutory parameters. *State v. Tracy*, 2005 MT 128, ¶ 12, 327 Mont. 220, 113 P.3d 297.

## DISCUSSION

¶29 *Whether the District Court abused its discretion when it denied Crosley's challenge for cause of potential juror Aronson.*

¶30 A criminal defendant's right to trial by an impartial jury is guaranteed by the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution. The grounds for challenging potential jurors for cause in a criminal trial are statutorily provided in § 46-16-115(2), MCA. A potential juror may be excused for cause when a district court determines that a juror has "a state of mind in reference to the case or to either of the parties that would prevent the juror from acting with entire impartiality and without prejudice to the substantial rights of either party." Section 46-16-115(2)(j), MCA.

¶31 Structural error requiring automatic reversal occurs when a district court abuses its discretion by denying a defendant's challenge for cause, the defendant uses a peremptory challenge to dismiss the challenged juror, and the defendant exhausts all available

peremptory challenges. *State v. Good*, 2002 MT 59, ¶¶ 62-63, 309 Mont. 113, 43 P.3d 948. In this case, the District Court denied Crosley's challenge of Aronson for cause, Crosley then used a peremptory challenge to dismiss Aronson, and Crosley exhausted all available peremptory challenges. Thus, this issue turns on whether the District Court abused its discretion in denying Crosley's challenge for cause.

¶32 When voir dire examination of a potential juror raises serious doubts about the juror's ability to be fair and impartial, the juror should be removed for cause. *Robinson*, ¶ 8; *State v. Hausauer*, 2006 MT 336, ¶ 23, 335 Mont. 137, 149 P.3d 895; *State v. Golie*, 2006 MT 91, ¶ 8, 332 Mont. 69, 134 P.3d 95; *State v. Richeson*, 2004 MT 113, ¶ 14, 321 Mont. 126, 89 P.3d 958; *State v. Heath*, 2004 MT 58, ¶ 10, 320 Mont. 211, 89 P.3d 947; *State v. Freshment*, 2002 MT 61, ¶ 11, 309 Mont. 154, 43 P.3d 968. We review a potential juror's voir dire responses as a whole to determine whether a serious question arose regarding the juror's ability to be fair and impartial. *State v. Harville*, 2006 MT 292, ¶ 9, 334 Mont. 380, 147 P.3d 222; *Golie*, ¶ 10; *Heath*, ¶ 18.

¶33 A court abuses its discretion if it fails to excuse a potential juror whose actual bias is discovered during voir dire. *Heath*, ¶ 7. A common form of actual bias occurs when a potential juror has a "fixed opinion" of a defendant's guilt before trial begins. *Robinson*, ¶ 9; *Heath*, ¶ 16 (concluding that the "fixed opinion of guilt" rule is but one argument that can be asserted under the statutory "state of mind" ground for challenges for cause). Most examples of a "fixed opinion" of guilt involve potential jurors who express difficulty applying a presumption of innocence to a criminal defendant. *State v. Braunreiter*, 2008 MT 197, ¶¶ 24-25, 344 Mont. 59, 185 P.3d 1024 (district court abused

14

discretion by failing to dismiss juror who would require defendant to testify to prove innocence); *Hausauer*, ¶ 28 (juror's voir dire responses revealed serious question about her ability to afford defendant a presumption of innocence because she firmly believed there must be a good reason defendant was on trial); *Golie*, ¶ 15 (district court abused discretion by denying challenge for cause of potential juror who stated DUI was a "sore subject" for him due to unresolved accident in which he was injured by a drunk driver, and further indicated that he did not know if his "passionate concern" about DUI would negatively impact defendant); *Good*, ¶ 53 (potential jurors' adherence to belief that a sexual abuse victim would not lie demonstrated serious question about ability to act with impartiality and afford defendant presumption of innocence); *State v. DeVore*, 1998 MT 340, ¶¶ 15-24, 292 Mont. 325, 972 P.2d 816 (district court abused discretion by failing to dismiss two jurors with an unwavering belief that a criminal defendant "must be guilty of something" to be on trial, which demonstrated an inability to afford the defendant the presumption of innocence), *overruled in part on other grounds by Good*, ¶ 63.

¶34 Another improper "state of mind" involves a potential juror who expresses an inability to follow the law by stating an actual bias directly related to "an issue critical to the outcome of the case." *Freshment*, ¶ 16 (district court abused its discretion in failing to dismiss two potential jurors who stated an actual bias regarding whether defendant could have a reasonable belief victim was age 16, which was legal defense asserted for sexual intercourse without consent; jurors both stated they could not acquit even if they found defendant had a reasonable belief that victim was at least 16 years old).

¶35 "In contrast, if a prospective juror merely expresses some concern about remaining impartial, but believes he can lay aside any concerns and fairly weigh the evidence, the district court is not required to remove the juror for cause." *Robinson*, ¶ 10. This Court has affirmed a district court's denial of challenges for cause of potential jurors who admitted having doubts about a defendant's innocence, but responded that they could set aside their concerns. *State v. Normandy*, 2008 MT 437, ¶¶ 23-25, 347 Mont. 505, 198 P.3d 834 (affirming denial of challenge for cause when potential juror has predisposition against domestic violence, but not defendant); *Robinson*, ¶ 13 (deferring to district court's decision not to excuse potential juror for cause when court had considered juror's conflicting statements regarding presumption of innocence); *State v. Rogers*, 2007 MT 227, ¶¶ 25-26, 339 Mont. 132, 168 P.3d 669 (finding juror's mere hesitancy or concern about ability to be impartial in sexual abuse trial did not raise serious questions requiring removal for cause); *State v. Marble*, 2005 MT 208, ¶¶ 20-21, 328 Mont. 223, 119 P.3d 88 (concluding that juror with strong religious beliefs about charges at issue did not need to be removed for cause, because he consistently stated that he would follow the law and fairly weigh the evidence); *Heath*, ¶¶ 25, 34-35 (finding that juror who had volunteered as rape survivor advocate and been stalked by ex-boyfriend could set aside experiences to look at facts objectively); *State v. Falls Down*, 2003 MT 300, ¶¶ 25-36, 318 Mont. 219, 79 P.3d 797 (concluding that challenged jurors demonstrated no fixed opinion of guilt based on what they heard in the media and could be fair and impartial). In fact, a district court has considerable discretion in determining whether to excuse a juror for cause:

When a juror makes conflicting statements, as in this case, the decision

whether to grant a challenge for cause is within the discretion of the trial judge, who has the ability to look into the eyes of the juror in question, and to consider her responses in the context of the courtroom, and then determine whether serious doubts exist about the juror's ability to be impartial.

*Robinson*, ¶ 13.

¶36    Aronson never expressed a fixed opinion of Crosley's guilt or actual bias against Crosley.  While there was much questioning about Aronson's ability to fairly weigh testimony from Detective Clarkson against other testimony, this is significantly different than the type of improper state of mind that raises serious doubts about a juror's ability to be fair and impartial.  This Court has held that a district court abused its discretion by not denying a challenge for cause when a potential juror expressed difficulty affording a criminal defendant the presumption of innocence or cannot properly apply the law.  Beyond that our review has been more deferential.

¶37    Aronson admitted that he would give a lot of credibility to Clarkson's testimony because he knew him.  But when further asked whether he could look at the facts, weigh them out, and keep an open mind, Aronson responded, "Somewhat yeah.  I'd tend to believe Mr. Clarkson, but I'd try to keep an open mind, I guess."  The prosecutor followed up on this response by clarifying, "Could you keep an open mind, look at the facts?"  Aronson replied affirmatively, "Uh-huh."  While these answers perhaps lack the conviction that defense counsel would prefer, they do not raise serious doubts about Aronson's ability to be fair and impartial.

¶38    Defense counsel's questioning failed to raise any serious doubts about Aronson's ability to be fair and impartial, despite persistent exploration of the impacts of weighing

Clarkson's testimony strongly. Aronson consistently acknowledged valuing Clarkson's credibility, but when questioning shifted from abstract-evidence weighing to fairness, Aronson's answers did not reveal any actual bias. Defense counsel asked whether Aronson would be fair to other jurors during deliberations or whether he would just defer to Clarkson. Aronson replied, "People can make mistakes on what they think they saw, too. I'd consider that, of course, but I just don't think that Pete [Clarkson] would lie on the witness stand." Defense counsel attempted to clarify that the issue was not whether Clarkson would lie, but how differences of opinion between Clarkson and other witnesses would affect Aronson's judgment. Aronson responded, "I would look at if from what people have said." These answers demonstrate that Aronson would not blindly accept Clarkson's testimony in the face of differences of opinion. In fact, when finally asked the dispositive question, whether he could be absolutely fair to Crosley, Aronson replied, "It would have to depend on what it was, what he said. If it was, I guess, an opinion versus something that – you have to weigh opinions versus facts, too, I guess." Defense counsel later repeated the dispositive question of whether he could be fair to Crosley, and Aronson answered, "I think so. I guess, you know, you really don't know until you know what they're both saying." Later Aronson indicated he would "try to be unbiased."

¶39 We cannot find any actual bias in Aronson's consistent responses regarding how he might weigh witness credibility when such responses never raise any serious doubts about his ability to be fair and impartial to Crosley. We agree with the prosecutor's response to defense counsel's challenge to Aronson for cause: "I heard Mr. Aronson say he could be fair, and he recognizes he knows people, but a lot of people know people in

18

the valley here, so I think he answered that he could be fair in weighing out the testimony." Indeed Aronson never said that he could not be fair or impartial to Crosley. While Aronson acknowledged that he would find Clarkson's testimony more credible than someone he did not know, he allowed that Clarkson could make mistakes and that he would weigh the evidence heartily. Later Aronson noted that he thought incest was a horrible thing, "but we have to know whether a person did it or not." This spontaneous response reinforces his impartiality. The District Court excused ten potential jurors for cause as a result of admissions that jurors could not be fair; would shift the burden of proof to the defendant; could not base a decision solely on the evidence; or had personal experiences that would affect their judgment. Aronson fell short of these improper states of mind and we defer to the discretion of the district court judge "who has the ability to look into the eyes of the juror in question, and to consider [his] responses in the context of the courtroom, and then determine whether serious doubts exist about the juror's ability to be impartial." *Robinson*, ¶ 13.

¶40 Additionally, Clarkson's importance as a trial witness should be placed in proper perspective. Clarkson did not interview Crosley during his investigation, and only testified regarding his investigation, including his interviews with A.P. The jury was never required to weigh Clarkson's testimony against an adverse party. In fact, to the extent that defense counsel cross-examined Clarkson regarding inconsistencies in A.P.'s recollections between her interviews in 1998 and 2006, his credibility as a witness would actually support Crosley's defense. Clarkson was one of many witnesses who helped corroborate various aspects of the children's allegations. His credibility as a witness was

19

not nearly as important as the credibility of the children, clearly the material witnesses. We cannot find any instances in the record where contradictory information was presented requiring the jury to weigh Clarkson's testimony against another witness' testimony. In this context, any tendency for Aronson to find Clarkson's testimony more credible than an unknown witness would not raise serious doubts about his ability to be fair and impartial.

¶41 The final question regarding whether the District Court abused its discretion is whether the court improperly rehabilitated Aronson. "[W]e have repeatedly admonished trial judges to refrain from attempting to rehabilitate jurors by putting them in a position where they will not disagree with the court." *Good*, ¶ 54. "Coaxed recantations in which jurors state they will merely follow the law, whether prompted by the trial court, the prosecution, or the defense, do not cure or erase a clearly stated bias which demonstrates actual prejudice against the substantial rights of a party." *Freshment*, ¶ 18. However, a district court does not abuse its discretion when the judge attempts to clarify a juror's answers or explain unclear concepts. *Robinson*, ¶ 14; *Heath*, ¶ 29.

¶42 We find that the District Court here attempted to clarify Aronson's answers to a series of questions from counsel attempting to elicit different responses from his consistent acknowledgement that he would value Clarkson's testimony strongly. Far from putting jurors "in a position where they will not disagree with the court," the District Court clarified whether Aronson would be willing to consider opposing testimony and surrounding circumstances for consistency. Aronson questioned whether people always speak the truth under oath, but acknowledged that he would "look for

20

consistency" and "very heartily" go where that led him. Since Aronson's answers did not denote a "clearly stated bias," there was no way that the District Court could have coaxed him to recant. We conclude that the District Court's questioning of Aronson was a clarification of the juror's ability to properly weigh the evidence, not a "coaxed recantation of bias."

¶43 Therefore, we hold that the District Court did not abuse its discretion in denying Crosley's challenge for cause of potential juror Aronson.

¶44 *Whether the District Court properly admitted evidence of other acts of incest outside of Ravalli County under the transaction rule.*

¶45 Crosley argues that the District Court erred by failing to apply the procedural and substantive safeguards of M. R. Evid. 404(b), as interpreted by the Modified *Just* Rule, in order to insure that the jury did not use evidence of other acts of incest that occurred outside of Ravalli County to improperly convict him. In particular, Crosley contends that the District Court committed reversible error by deleting essential language from his proposed jury instruction regarding the proper use of other acts evidence. Crosley further contends that the District Court committed plain error by failing to give a contemporaneous admonition when other acts evidence was presented to the jury.

¶46 The State argues that it did not present other acts evidence pursuant to M. R. Evid. 404(b), but introduced evidence of other acts of incest under the transaction rule and only gave a 404(b) notice out of caution and to avoid surprise. The State notes that when evidence is admissible pursuant to the transaction rule, the procedural requirements of the Modified *Just* Rule are not applicable.

21

¶47     M. R. Evid. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This Court's precedent, described as the Modified *Just* Rule, provides additional substantive and procedural criteria for the admission of other acts evidence. *State v. Buck*, 2006 MT 81, ¶¶ 72-74, 331 Mont. 517, 134 P.3d 53 (citing *State v. Just*, 184 Mont. 262, 268-69, 602 P.2d 957, 961 (1979) and *State v. Matt*, 249 Mont. 136, 142, 814 P.2d 52, 56 (1991)). Crosley claims that the District Court failed to fulfill two of the procedural requirements of the Modified *Just* Rule by not explaining to the jury the purpose of other acts evidence when introduced, and inadequately instructing the jury of the limited purpose of other acts evidence. *See Buck*, ¶ 74.

¶48     However, the Modified *Just* Rule has an exception. This exception is codified as the "transaction rule," which provides: "[w]here the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." Section 26-1-103, MCA. Pursuant to the transaction rule, evidence of other acts that are "inextricably linked to, and explanatory of, the charged offense is admissible notwithstanding the rules relating to 'other crimes' evidence." *State v. Lozon*, 2004 MT 34, ¶ 12, 320 Mont. 26, 85 P.3d 753. The transaction rule acknowledges that "a longstanding distinction exists between Rule 404(b) 'other crimes' evidence and evidence of a defendant's misconduct which is inseparably related to the alleged criminal act." *Lozon*, ¶ 12. Thus, the

requirements of the Modified *Just* Rule are not applied to evidence that "is not wholly independent or unrelated to the charged offense." *Lozon*, ¶ 12.

¶49 Evidence of Crosley's other acts of incest that occurred in California, Missoula, and Ronan are not wholly independent or unrelated to the charged offenses of incest in Ravalli County. Crosley began sexually abusing A.P. when she was four years old, and continued sexually abusing her until she finally disclosed the abuse at age 12. Crosley's sexual abuse of A.P. did not stop when the family left Ravalli County, and importantly, the first instance of sexual intercourse occurred in California, and early instances of anal sex occurred in Ronan. Crosley's sexual abuse escalated over time and A.P.'s recollections of this escalating abuse were marked by the changing locations where the abuse occurred. All of these instances of sexual abuse, regardless of their location, are inextricably linked to, and explanatory of, the charged offenses in Ravalli County.

¶50 The fact in dispute here is whether the various charged acts of incest occurred. Evidence of that fact includes uncharged acts of incest that occurred outside of Ravalli County since those acts are clearly related to and not independent of the continuous and escalating nature of Crosley's sexual abuse. Thus, evidence of Crosley's escalating sexual abuse form part of the transaction in dispute and are admissible under § 26-1-103, MCA.

¶51 Crosley suggests that because the District Court gave a modified instruction on "Evidence of Other Acts," the court must have concluded that the uncharged acts were not admissible pursuant to the transaction rule. Similarly, Crosley argues that the District Court seemed to indicate that other acts evidence was admissible pursuant to the

23

Modified *Just* Rule because the court found the State's notice sufficient. We disagree with this either/or argument. The State objected to Crosley's proposed jury instruction on other acts evidence, noting that the other acts were "first offered and admitted as part of a continuous transaction." Further, the State provided notice that it intended to introduce evidence of other acts of incest in "an abundance of caution" and to allow Crosley to fully prepare his defense. The Notice relied primarily on the transaction rule, and alternatively on the Modified *Just* Rule. Indeed, we have encouraged courts to apply the safeguards of the Modified *Just* Rule liberally to protect defendants from unfair surprise. *Buck*, ¶ 82. While we conclude that the District Court correctly applied the transaction rule in admitting evidence of other acts of incest, we find no error in the District Court's other acts instruction nor its assessment of the State's Notice.

¶52 Accordingly, we hold that evidence of other acts of incest outside of Ravalli County was admissible under the transaction rule. The District Court did not abuse its discretion in admitting this evidence pursuant to § 26-1-103, MCA.

¶53 *Whether Crosley was denied effective assistance of counsel.*

¶54 The Sixth Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment, and Article II, Section 24, of the Montana Constitution guarantee a criminal defendant the right to effective assistance of counsel. To evaluate claims of ineffective assistance of counsel, this Court has adopted the two-prong test from *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *State v. Kougl*, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095. Under the *Strickland* test, the defendant must establish that 1) counsel's performance fell below an objective standard of

24

reasonableness, and 2) a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Kougl*, ¶ 11.

¶55 There is a strong presumption under the first *Strickland* prong that trial counsel's performance was based on sound trial strategy and falls within the broad range of reasonable professional conduct. *State v. Hendricks*, 2003 MT 223, ¶ 7, 317 Mont. 177, 75 P.3d 1268. Regarding the second *Strickland* prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome. When a defendant challenges a conviction, the defendant must show the fact finder's reasonable doubt respecting guilt could have been routed by the unprofessional errors of counsel." *State v. Harris*, 2001 MT 231, ¶ 19, 306 Mont. 525, 36 P.3d 372 (citation omitted).

¶56 Crosley claims that his defense counsel was ineffective when he failed to object to other acts evidence and failed to request that the court provide a contemporaneous admonition at the time this evidence was admitted. Crosley further contends that his defense counsel's decision not to object to the State's Notice was not a strategic or tactical decision, but rather a decision based on a misunderstanding of the law. Crosley bases this contention on the fact that his defense counsel believed that the Notice "would have met the legal standards." We disagree with this characterization of defense counsel's actions. As discussed above, evidence of other acts of incest was admissible under the transaction rule, and therefore Crosley's defense counsel did not act based on a misunderstanding of the law. Crosley has not established that his counsel's performance fell below an objective standard of reasonableness under *Strickland*. Since evidence of

25

other acts of incest was admissible under the transaction rule, any objections to that evidence or requests for contemporaneous admonitions would be futile. Therefore, we hold that Crosley was not denied effective assistance of counsel.

¶57 *Whether the District Court erred in sentencing Crosley pursuant to the law in effect at the time of sentencing rather than at the time of the offenses.*

¶58 This Court has consistently held that a person has the right to be sentenced under the statutes which are in effect at the time of the offense. *Tracy*, ¶ 16. Crosley notes that he was convicted of seven counts of incest in violation of § 45-5-507(1), (4), MCA, each pertaining to a different period of time:

> Count 1, A.P., 1989-1991 (Second Street, Corvallis);
> Count 2, A.P., 1991-1992 (Marcus Street);
> Count 3, A.P., 1992-1993 (Charlos Heights, Roaring Lion Road);
> Count 4, A.P., 1993-1995 (Honey House Lane, Corvallis (grandparents' house));
> Count 5, A.P., 1995-1996 (Fish Hatchery Road);
> Count 6, A.P., 1996-1998 (Main Street, Corvallis);
> Count 8, J.P., 1995-1998.

The legislature has amended the maximum penalty for an incest conviction several times. In 1989, the legislature raised the maximum term of imprisonment for incest, from ten to 20 years, when a victim is under 16 years old and the defender is three or more years older. In 1995, the legislature raised the maximum penalty to life imprisonment. In 2007, the legislature again amended the incest statute to provide particular punishments when an incest victim is 12 years old or younger. This version of the statute was in effect when the District Court sentenced Crosley on May 16, 2007, but not necessarily when the offenses were committed. Crosley notes that the District Court's imposition of seven life sentences (actually six life sentences, and 50 years with 25 suspended for count 8) under

26

§ 45-5-507(4), MCA, was an unconstitutional ex post facto application of the law. We agree. Therefore, we vacate Crosley's sentences on incest counts 1, 2, 3, and 4, and remand for resentencing in accordance with the statutes in effect at the time of the offenses. We affirm Crosley's life sentences on counts 5 and 6, and 50 years with 25 suspended on count 8, which punish offenses committed after 1995.

¶59    Affirmed in part, vacated in part, and remanded for re-sentencing.

/S/ MIKE McGRATH

We concur:

/S/ JOHN WARNER
/S/ JIM RICE
/S/ BRIAN MORRIS

Justice W. William Leaphart specially concurring.

¶60    I concur in the Court's resolution of Issues 2, 3, and 4. I join in Justice Nelson's special concurrence as to Issue 1.

/S/ W. WILLIAM LEAPHART

Justice James C. Nelson, specially concurring.

¶61    I concur in the Court's resolution of Issue 4 (the sentencing issue, discussed at ¶ 58). I specially concur in the Court's resolution of Issues 1, 2, and 3. My primary concerns relate to Issue 2; however, I first address a number of points related to Issue 1.

**Issue 1**

¶62 On the question of whether the District Court abused its discretion when it denied Crosley's challenge for cause of potential juror Aronson, I concur in the result the Court reaches, but I do not agree with all of the Court's analysis. First, I do not believe that a veniremember must actually *say* that he cannot be fair or impartial before we can find actual bias (Opinion, ¶ 39). "Bias can be revealed by a juror's express admission of that fact, but, more frequently, jurors are reluctant to admit actual bias, and the reality of their biased attitudes must be revealed by circumstantial evidence." *State v. Chastain*, 285 Mont. 61, 64, 947 P.2d 57, 59 (1997) (internal quotation marks omitted), *overruled in part on other grounds*, *State v. Herrman*, 2003 MT 149, ¶ 33, 316 Mont. 198, 70 P.3d 738.

¶63 Second, I cannot join the Court's reasoning at ¶ 40, which resembles a harmless error analysis (i.e., because Clarkson's testimony ultimately was not that "important" and may have even "supported" Crosley's defense, any error in not removing Aronson for cause was harmless). We have previously held that "jury selection errors are 'structural' errors and as such, they are not amenable to harmless error review." *State v. Bird*, 2002 MT 2, ¶ 39, 308 Mont. 75, 43 P.3d 266. Even more to the point here, we have held that "structural error occurs if: (1) a district court abuses its discretion by denying a challenge for cause to a prospective juror; (2) the defendant uses one of his or her peremptory challenges to remove the disputed juror; and (3) the defendant exhausts all of his or her peremptory challenges." *State v. Good*, 2002 MT 59, ¶ 62, 309 Mont. 113, 43 P.3d 948.

28

¶64 Notably, the dissenting opinion in *Good* argued for the same sort of analysis that appears in ¶ 40 of today's Opinion. *Compare Good*, ¶ 64 ("The dissent thus maintains that, in a criminal prosecution in which the State's evidence is uncontroverted, there are no disputed facts and thus no potential for prejudice arising from an erroneous denial of a challenge for cause."), *with* Opinion, ¶ 40 ("We cannot find any instances in the record where contradictory information was presented requiring the jury to weigh Clarkson's testimony against another witness' testimony."). The *Good* Court rejected the dissent's approach, explaining that

> in a criminal case, the accused is not obligated to put on any evidence or to disprove the State's case—rather, innocence is presumed. Thus, even if the State's case is uncontroverted, the matter is still presented to the jury and the jury has the prerogative of rejecting the State's case for any number of reasons including that the jurors find the State's witnesses not credible, its evidence improbable, or its proof insufficient.

*Good*, ¶ 65. For this reason, the Court's subjective analysis of "Clarkson's importance as a trial witness" (Opinion, ¶ 40) is inapt.

¶65 The question is whether, in light of his stated inclination to "give a lot of credibility to [Clarkson's] testimony from knowing him," Aronson should have been removed from the venire. While I consider this to be a close question, I conclude that on the record here (including the follow-up questioning of Aronson), Crosley has not established that Aronson would have been unable to determine Crosley's guilt or innocence fairly and impartially. Given our standard of review, therefore, I agree with the Court that the District Court did not abuse its discretion in denying the challenge for cause.

29

**Issues 2 and 3**

¶66 Issue 2 concerns the admission of evidence of prior uncharged misconduct by Crosley outside Ravalli County (specifically, in Missoula County and Lake County and on the trips to California). Generally, the substantive and procedural requirements of the Modified *Just* Rule must be met before evidence of other crimes, wrongs, or acts is admissible. *State v. Just*, 184 Mont. 262, 269, 274, 602 P.2d 957, 961, 963-64 (1979); *State v. Matt*, 249 Mont. 136, 142-43, 814 P.2d 52, 56 (1991). The Court explains, however, that the so-called "transaction rule" is an "exception" to these requirements. Opinion, ¶ 48. Thus, although the Modified *Just* Rule indisputably was not complied with in this case, the Court holds that evidence of Crosley's prior bad acts was admissible under the transaction rule. Opinion, ¶ 52.

¶67 I have grave concerns about this Court's ever-expanding pronouncements concerning the scope of the transaction rule. Over the past 15 years, in case after case, we have broadened the transaction rule to encompass more and more evidence that otherwise would have fallen within the strictures of the Modified *Just* Rule, and one cannot help but visualize the transaction rule as a sort of maverick Pac-Man that blips from case to case devouring "bad acts" evidence as quickly as it appears. We have read into the transaction rule language far beyond that used in the statute (§ 26-1-103, MCA), and I believe that it is time we rein in this exception before it completely swallows the

Modified *Just* Rule and the general prohibition against evidence of other crimes, wrongs, or acts.[1]

¶68    In *State v. Hansen*, 1999 MT 253, 296 Mont. 282, 989 P.2d 338, we decided that the better practice is to abandon the use of amorphous doctrines of evidence such as corpus delicti and res gestae and "to, instead, use the specific rule of evidence or statute that applies to the particular factual situation presented" in order to determine the admissibility of the evidence at issue.  *Hansen*, ¶ 81; *see also Hansen*, ¶¶ 27-84 (discussing corpus delicti and res gestae).  Thus, our analysis must begin with an applicable statute or rule of evidence.

¶69    The Court contends that § 26-1-103, MCA, is applicable here.  This statute states:

> Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction.

Yet, the Court does not apply the actual language of this statute.  Instead, the Court applies a number of standards (articulated in ¶ 48) which have been "associated" with § 26-1-103, MCA, but which are broader than the statutory language and have no place whatsoever in our jurisprudence.

¶70    Specifically, the Court states that "evidence of other acts that are 'inextricably linked to, and explanatory of, the charged offense' " is admissible under the transaction rule.  Opinion, ¶ 48 (quoting *State v. Lozon*, 2004 MT 34, ¶ 12, 320 Mont. 26, 85 P.3d

---

[1] Notably, counsel argues in Crosley's opening and reply briefs on appeal that pursuant to this Court's recent cases applying the transaction rule, "the exception has swallowed Rule 404(b) and the Modified *Just* Rule and the procedural and substantive safeguards of those rules have essentially been discarded."  Counsel urges us to "revisit" our formulation of the transaction rule.

753). Yet, the words "inextricably linked to, and explanatory of, the charged offense" do not appear in § 26-1-103, MCA. The Court goes on to state that "the requirements of the Modified *Just* Rule are not applied to evidence that 'is not wholly independent or unrelated to the charged offense.' " Opinion, ¶ 48 (quoting *Lozon*, ¶ 12). Yet, if any "bad acts" evidence which is "not wholly independent or unrelated to the charged offense" is admissible under the transaction rule, then I question why we retain the pretense of having a Modified *Just* Rule.

¶71 The standards articulated in *Lozon* and repeated in ¶ 48 of the Court's Opinion evolved from this Court's jurisprudence under the doctrines of corpus delicti and res gestae. *See State v. Derbyshire*, 2009 MT 27, ¶ 32, 349 Mont. 114, 201 P.3d 811. Over the years, we have repeatedly associated those standards with § 26-1-103, MCA. *See e.g. State v. Wing*, 264 Mont. 215, 224-25, 870 P.2d 1368, 1374 (1994); *State v. Atkins*, 277 Mont. 103, 110, 920 P.2d 481, 485 (1996); *State v. Beavers*, 1999 MT 260, ¶ 48, 296 Mont. 340, 987 P.2d 371; *State v. Insua*, 2004 MT 14, ¶ 40, 319 Mont. 254, 84 P.3d 11; *Lozon*, ¶¶ 11-12; *State v. Marshall*, 2007 MT 198, ¶ 16, 338 Mont. 395, 165 P.3d 1129; *State v. Bieber*, 2007 MT 262, ¶¶ 54, 57, 339 Mont. 309, 170 P.3d 444; *State v. Hill*, 2008 MT 260, ¶ 39, 345 Mont. 95, 189 P.3d 1201. I have done so myself in several recent cases. *See e.g. State v. Buck*, 2006 MT 81, ¶ 76, 331 Mont. 517, 134 P.3d 53; *State v. Gittens*, 2008 MT 55, ¶ 37, 341 Mont. 450, 178 P.3d 91; *State v. Mackrill*, 2008 MT 297, ¶¶ 40-41, 345 Mont. 469, 191 P.3d 451.

¶72 However, we are constrained by § 1-2-101, MCA, to apply the language of § 26-1-103, MCA, as written and not to read into this statute extraneous language which

effectively perpetuates the doctrines of res gestae and corpus delicti.[2] We discarded those doctrines in *Hansen* a decade ago, and they have no business "hiding out" in our jurisprudence under § 26-1-103, MCA. Again, the statute states: "Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." Nothing in this language supports the proposition that evidence which is simply "explanatory of" a charged offense or "not wholly independent or unrelated to" the offense is admissible pursuant to § 26-1-103, MCA. Such evidence may be admissible under another statute or rule,[3] but it is pure sophistry to hold that it is admissible under § 26-1-103, MCA. The critical language of the statute states that the declaration, act, or omission must "form part of" the transaction which is itself the fact in dispute or evidence of that fact. Merely being "explanatory of" or "not wholly independent or unrelated to" the transaction is not the language of § 26-1-103, MCA.

¶73    We have previously observed that § 26-1-103, MCA, "is simply an exception to the hearsay rule." *Payne v. Buechler*, 192 Mont. 311, 316, 628 P.2d 646, 649 (1981) (citing *Callahan v. Chicago, Burlington & Quincy R.R. Co.*, 47 Mont. 401, 133 P. 687 (1913)). Indeed, insofar as the word "declaration" is concerned, § 26-1-103, MCA, is nothing more than a statutory precursor to M. R. Evid. 803(1) and (2) (respectively, the

---

[2] "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA.

[3] Notably, under the federal rules, "evidence of the defendant's commission of another offense or offenses of child molestation is admissible [in a criminal case in which the defendant is accused of an offense of child molestation], and may be considered for its bearing on any matter to which it is relevant." Fed. R. Evid. 414(a).

"present sense impression" and "excited utterance" exceptions to the hearsay rule).  As this Court explained the statute 96 years ago in *Callahan*:

> This provision was not intended to embody the statement of a rule by which to determine the competency of such declarations as those in question, but to be a mere direction that they must be deemed competent *when they are so connected with the main transaction as to form a part of it*.  It states one of the exceptions to the general rule recognized by all the courts in common-law jurisdictions which requires the exclusion of hearsay statements, *viz.*: that when declarations by the participant in or an observer of the litigated act are so nearly connected with it in point of time that they may be regarded as a spontaneous, necessary incident, explaining and characterizing it, they may be proved as a part of it without calling the person who made them.  The principle upon which the exception is founded is that the declarations were made while the mind of the speaker was laboring under the excitement aroused by the incident, before there was time to reflect and fabricate, and hence the solemnity of the oath is not necessary to give it probative value. . . .  "The general rule is that the declarations must be *substantially contemporaneous with the litigated transaction* and be the instinctive, spontaneous utterances of the mind while under the active, immediate influence of the transaction, the circumstances precluding the idea that the utterances are the result of reflection or design to make false or self-serving declarations."

*Callahan*, 47 Mont. at 410-11, 133 P. at 689 (emphases added); *cf.* M. R. Evid. 803(1) (defining present sense impression as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter"); M. R. Evid. 803(2) (defining excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition").

¶74     When these principles are applied to the "act or omission" language of § 26-1-103, MCA, it is clear that the statute permits evidence of acts or omissions which are "substantially contemporaneous with the litigated transaction" and are "so connected with

34

the main transaction as to form a part of it." For this reason, the standards "inextricably linked to" and "inseparably related to" (also recited by the Court in ¶ 48 (citing *Lozon*, ¶ 12)) may be plausible interpretations of § 26-1-103, MCA; however, such language cannot be interpreted as justifying the State's "complete the picture" argument in the present case. In this connection, I agree with the following observations of the Court of Appeals in *United States v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000):

> The "complete the story" definition of "inextricably intertwined" threatens to override Rule 404(b). A defendant's bad act may be only tangentially related to the charged crime, but it nevertheless could "complete the story" or "incidentally involve" the charged offense or "explain the circumstances." If the prosecution's evidence did not "explain" or "incidentally involve" the charged crime, it is difficult to see how it could pass the minimal requirement for admissibility that evidence be relevant. *See* FED.R.EVID. 401 and 402.
>
> The district court invoked the "*res gestae*" doctrine in finding the April 17 evidence inextricably intertwined with the charged crime. [Citation.] To the extent this Latinism[4] was meant to suggest that the April 17 evidence was outside Rule 404(b) because it "explained the events" or "completed the story," we do not agree. As we have said, all relevant prosecution evidence explains the crime or completes the story. The fact that omitting some evidence would render a story slightly less complete cannot justify circumventing Rule 404(b) altogether. Moreover, evidence necessary to complete a story—for instance by furnishing a motive or establishing identity—typically has a non-propensity purpose and is admissible under Rule 404(b). We see no reason to relieve the government and the district court from the obligation of selecting from the myriad of non-propensity purposes available to complete most any story.

*Bowie*, 232 F.3d at 928-29.

---

[4] "*See United States v. Krezdorn*, 639 F.2d 1327, 1332 (5th Cir. 1981) (stating that the inextricably intertwined doctrine is sometimes labeled *res gestae*, 'an appellation that tends merely to obscure the analysis underlying the admissibility of the evidence.')." *Bowie*, 232 F.3d at 928 n. 2.

¶75 Likewise here, the appropriate course of action with respect to the transaction rule is to apply the plain (and clearly narrow) language of § 26-1-103, MCA, and to require the prosecution in all other instances to comply with the requirements of the Modified *Just* Rule. I do not suggest that the State should be barred from ever introducing "bad acts" evidence. Rather, the State should simply comply with the substantive and procedural requirements for doing so and not seek to circumvent those requirements, in a mounting cascade of cases, by resorting to the transaction rule.

¶76 In the case at hand, the State introduced evidence of other crimes, wrongs, or acts committed by Crosley in California, Missoula County, and Lake County. None of those acts, however, "form[ed] part of a transaction which [was] itself the fact in dispute or evidence of that fact." Section 26-1-103, MCA. The facts in dispute were whether Crosley committed specific incidents of incest and assault in Ravalli County during the discrete time intervals alleged in the Information.[5] Crosley's acts at other times and in other places, reprehensible as they were, simply were not the facts in dispute. Moreover,

---

[5] The State alleged the following counts of incest and assault:
Charge I: Incest
     Count 1, A.P., 1989-91
     Count 2, A.P., 1991-92
     Count 3, A.P., 1992-93
     Count 4, A.P., 1993-95
     Count 5, A.P., 1995-96
     Count 6, A.P., 1996-98
     Count 7, J.P., 1991-95
     Count 8, J.P., 1995-98
Charge II: Assault on a Minor
     Count 1, A.P., 1992-98
     Count 2, J.P., 1994-98
     Count 3, R.P., 1994-98

evidence of those acts which he committed at other times and in other places outside Ravalli County cannot be said to be evidence of what he did in Ravalli County, except in the sense that "Because he did it at other times and places, he must have done it on the occasions charged here." Such an inference, however, is not permissible for determining Crosley's guilt. M. R. Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.").

¶77 The State's argument that Crosley's actions were all part of one long "transaction" might have had merit had the prosecutor charged a continuous course of conduct. But the prosecutor did not charge a continuous course of conduct, and the State's attempt to justify the evidence of uncharged misconduct committed in California, Missoula County, and Lake County as all being part of a "transaction" is wholly without merit.

¶78 In sum, by reading into § 26-1-103, MCA, language which is not there, we permit the introduction of evidence which M. R. Evid. 404 specifically proscribes—absent compliance with the substantive and procedural protections afforded by the Modified *Just* Rule. And, indeed, that is how the "transaction rule" is being utilized: to end-run M. R. Evid. 404, *Just*, and *Matt*.

¶79 For these reasons, I would hold that the evidence of Crosley's misconduct and reprehensible acts in California, Missoula County, and Lake County were not admissible under § 26-1-103, MCA.

¶80 This conclusion leads to the question of what, if any, remedy is appropriate here. Crosley concedes that he did not object to the introduction of any of this evidence.

37

Indeed, defense counsel stated during the final pretrial conference that the State's Notice of Intent to Introduce Evidence of Other Crimes, Wrongs & Acts "met the legal standards." Moreover, counsel offered no objections to the evidence when it was offered by the State during trial, and counsel participated in drafting the "other acts" instruction given by the District Court immediately prior to closing arguments (an instruction Crosley now claims was erroneous).

¶81 Under these circumstances, Crosley contends that we should invoke our inherent power of plain error review to review his challenges to the "bad acts" evidence. Crosley contends that the District Court erred by not giving the instructions specifically required by the Modified *Just* Rule. *See Matt*, 249 Mont. at 143, 814 P.2d at 56 ("At the time of the introduction of such evidence, the trial court shall explain to the jury the purpose of such evidence and shall admonish it to weigh the evidence only for such purposes," and "In its final charge, the court shall instruct the jury in unequivocal terms that such evidence was received only for the limited purposes earlier stated and that the defendant is not being tried and may not be convicted for any offense except that charged, warning them that to convict for other offenses may result in unjust double punishment."). I am not persuaded, however, that failing to review these alleged errors would "leave in question the fundamental fairness of the trial proceedings" as Crosley contends.

¶82 Alternatively, Crosley couches his challenge to the "bad acts" evidence in an ineffective assistance of counsel claim. Specifically, Crosley argues that defense counsel rendered ineffective assistance by failing to take appropriate steps to exclude this evidence, to object to its introduction, and to request appropriate cautionary instructions.

38

This argument has facial appeal; however, given the prosecutor's notice, which was grounded in both M. R. Evid. 404(b) and § 26-1-103, MCA, and given this Court's expansive—albeit erroneous—interpretations of § 26-1-103, MCA, and the "transaction rule" over the past 15 years, I cannot agree with Crosley that his counsel's conduct "fell below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances." *Whitlow v. State*, 2008 MT 140, ¶ 20, 343 Mont. 90, 183 P.3d 861.

**Conclusion**

¶83 For the foregoing reasons, I concur in the Court's resolution of Issue 4 and specially concur in the Court's resolution of Issue 1, 2, and 3.


/S/ JAMES C. NELSON


Justice Patricia O. Cotter joins the Special Concurrence of Justice James C. Nelson.

/S/ PATRICIA COTTER