DA 06-0623

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 211

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

FRANKLIN MATTHEW McLAUGHLIN,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC-04-208
Honorable Mike Salvagni, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jim Wheelis, Chief Appellate Defender; Helena, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General; Micheal S. Wellenstein;
Assistant Attorney General; Helena, Montana

          Marty Lambert, Gallatin County Attorney; Bozeman, Montana

Submitted on Briefs:  July 16, 2008

Decided:  June 23, 2009

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Frank McLaughlin appeals his conviction in the Eighteenth Judicial District Court of one count of felony Attempted Assault With a Weapon and one count of misdemeanor Assault, arising out of an incident in which he fought with three police officers trying to detain him. We affirm.

¶2     McLaughlin raises the following issues:

1. Did the District Court abuse its discretion by admitting results of a urine test indicating the presence of methamphetamine and marijuana in McLaughlin's body at the time of his arrest?

2. Did the District Court abuse its discretion by instructing the jury on intoxication?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3     On June 25, 2004, at 2:50 a.m., Belgrade Police Officer Lensing stopped the truck McLaughlin was driving because its taillights were not functioning. In response to Lensing's request, McLaughlin did not provide a driver's license; but instead gave Lensing a State of Washington birth certificate for a Jesse Snyder as his identification. Lensing ran a driver's license check on Snyder and received a physical description of a male over six feet tall and 200 pounds. McLaughlin is five feet eight inches tall and weighs 145 pounds. When further questioned, McLaughlin gave illogical and inconsistent answers. Lensing called for backup and Gallatin County Deputies Lewis and Quillen responded.

2

¶4     Video footage from a patrol vehicle shows that the officers asked McLaughlin to step out of his car and patiently attempted to ascertain his true identity. McLaughlin acted fidgety, nervous, and shaky, which the officers would later testify caused them to suspect he was under the influence of methamphetamine. In response to McLaughlin's behavior and continued refusal to reveal his true identity, the officers asked him to turn around so they could handcuff him. McLaughlin began to turn around, but then bolted past the officers and ran across the road. The officers pursued and caught him, leading to an extended struggle. The patrol car's video camera did not record the struggle itself because it transpired out of view, but a microphone worn by one of the officers picked up sounds of the struggle. The video recording and accompanying audio recording were introduced as evidence and played for the jury, in addition to the officers' testimony.

¶5     The officers forced McLaughlin to the ground, attempting to place him on his stomach to handcuff him, but McLaughlin fought the officers by kicking and punching. The officers tried submission holds to control McLaughlin, but he showed no pain and squirmed out of them. Lensing testified that he had never encountered that level of strength and resistance from someone of McLaughlin's size. During the struggle, McLaughlin grabbed Lensing's gun and pulled on it with enough force to twist Lensing's gun belt and pants. The gun was not removed because of the holster's safety strap and Lensing's pushing on McLaughlin's hand to keep the gun in the holster. Struggling in the darkness, Lensing shouted that McLaughlin had his gun. The officers testified about the fear this caused, as their training indicates that ninety percent of officers who lose their gun during a struggle are shot. Lewis and Quillen could not see whether

3

McLaughlin had actually taken Lensing's gun. Lewis sprayed McLaughlin's face with pepper spray, but this had no apparent effect on McLaughlin. Lensing was able to push McLaughlin's hand off his gun and then pull away from him. The other officers, fearful for their safety, asked Lensing if McLaughlin had gotten his gun. Lensing replied that he still had his gun, so the officers continued the effort to subdue McLaughlin. Then McLaughlin grabbed Quillen's holstered gun and jerked it, but it was likewise retained by the holster's safety strap. Quillen told the other officers that McLaughlin now had his gun. Quillen tried to push McLaughlin away from his gun, but did not initially succeed. He testified he began to tire and did not know how much longer he could struggle with McLaughlin. The other officers could not see whether McLaughlin had obtained Quillen's gun and were fearful about the use of this weapon against them. Quillen shouted for the other officers to shoot McLaughlin, but Lewis and Lensing began hitting McLaughlin with their batons. When their hits to McLaughlin's thighs had no apparent effect, Lewis began hitting McLaughlin's knees. The officers testified that this tactic brought the first noticeable impact upon McLaughlin, as he finally stopped struggling and said "ow." Quillen got control of his gun, and the officers were able to handcuff McLaughlin.

¶6     The officers took McLaughlin to the hospital for a physical examination and requested that a blood test be drawn. Dr. Gipe examined McLaughlin and independently requested a urine drug screen. The screening showed the presence of methamphetamine and marijuana, but did not indicate the levels of these substances.

4

¶7 The State charged McLaughlin with two counts of Attempted Assault With a Weapon. McLaughlin moved to suppress the results of the blood test and moved in limine to prohibit any evidence of drug use during the trial. The District Court dismissed the motion to suppress as moot because the State did not intend to introduce the results of the blood test. The District Court denied the motion in limine.

¶8 At trial, the District Court instructed the jury, over McLaughlin's objection, that intoxication is not a defense to a crime and cannot be considered in determining the existence of a mental state. The jury found McLaughlin guilty of one count of Attempted Assault With a Weapon, not guilty of the second count of Attempted Assault With a Weapon, and guilty of the lesser included offense of misdemeanor Assault. McLaughlin appeals.

## STANDARD OF REVIEW

¶9 We review a district court's evidentiary rulings to determine whether the district court abused its discretion. *State v. McCaslin*, 2004 MT 212, ¶ 15, 322 Mont. 350, 96 P.3d 722 (overruled on other grounds). A district court has broad discretion to determine whether evidence is relevant and admissible and, absent a showing of abuse of discretion, we will not overturn a court's evidentiary determinations. *McCaslin*, ¶ 15. An abuse of discretion occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason. *McCaslin*, ¶ 15.

¶10 A district court has broad discretion to instruct the jury and we review instructions in criminal cases to determine whether the instructions, as a whole, fully and fairly instruct on the law applicable to the case. *McCaslin*, ¶ 14.

5

## DISCUSSION

¶11    **1.  *Did the District Court abuse its discretion by admitting results of a urine test indicating the presence of methamphetamine and marijuana in McLaughlin's body at the time of his arrest?***

¶12    McLaughlin argues the District Court erred by admitting the urine drug test because it constituted improper character evidence under M. R. Evid. 404(b), was unduly prejudicial, and did not come within the transaction rule.  McLaughlin argues that the transaction rule does not apply because the presence of drugs is not an element of the assault charges, the State has no need to explain the reasons for McLaughlin's behavior, and there was an insufficient probative linkage between the crime and the use of drugs. Additionally, McLaughlin asserts that the court erred by not conducting a *Daubert*[1] hearing and that the evidence should have been excluded for improper foundation and a failure to comply with the requirements for expert testimony.

¶13    The State responds that the evidence was within the transaction rule because it explains the circumstances and aids in establishing the officer's reasonable apprehension of serious bodily injury.  The State also replies that a *Daubert* hearing was unnecessary and that McLaughlin waived the issues of foundation and expert testimony by raising them for the first time on appeal.

¶14    The statutory transaction rule states that "[w]here the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction."  Section 26-1-103, MCA.  "Pursuant to the transaction rule, prior acts that are inextricably linked to, and

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

explanatory of, the charged offense are admissible notwithstanding the rules relating to 'other crimes' evidence." *State v. Gittens*, 2008 MT 55, ¶ 37, 341 Mont. 450, 178 P.3d 91 (quotations omitted). "[T]here is a distinction between Rule 404(b) 'other crimes' evidence and evidence of a defendant's misconduct which is inseparably related to the alleged criminal act." *State v. Makrill*, 2008 MT 297, ¶ 40, 345 Mont. 469, 191 P.3d 451. "[A]dmissibility under the transaction rule is based upon the jury's right to hear what occurred immediately prior and subsequent to the commission of the offense charged, so that they may evaluate the evidence in the context in which the criminal act occurred." *McCaslin*, ¶ 33 (quotation omitted).

¶15    In *McCaslin*, the defendant encountered three men upon leaving a bar and exchanged verbal insults. McCaslin stabbed several of the men and was charged with several assault offenses. McCaslin moved in limine to exclude evidence of his intoxication during the altercation, including a videotape recording of his behavior that was taken at the police station after he was arrested, arguing that the evidence was irrelevant and unduly prejudicial. We held that "McCaslin's behavior after the police arrested him was relevant as part of the transaction. The jury had a right to hear evidence illustrating McCaslin's behavior subsequent to his arrest in order to provide context to the criminal act." *McCaslin*, ¶ 34.

¶16    In *State v. Buck*, 2006 MT 81, 331 Mont. 517, 134 P.3d 53, the defendant was charged with the brutal murder of a man while burglarizing the man's home. At trial, Buck's friends testified that he had taken methamphetamine prior to the burglary and an officer testified that Buck admitted being under the influence of methamphetamine. The

7

District Court denied Buck's motion in limine requesting that the evidence of methamphetamine be prohibited. We affirmed, stating that "[h]ere, the evidence of Buck's methamphetamine use is explanatory of the circumstances surrounding the charged offenses." *Buck*, ¶ 79. We mentioned that there was evidence that Buck was under the influence of methamphetamine, and "[t]hus, it appears that the evidence of Buck's methamphetamine use was not only relevant, but was inextricably and inseparably linked with the charged offenses . . . ." *Buck*, ¶ 79. We cautioned that "[w]e are *not* suggesting that evidence of methamphetamine use prior to an alleged crime is, without more, generally admissible." *Buck*, ¶ 81 (emphasis in original).

¶17    McLaughlin relies heavily on this cautionary word in *Buck* in attempting to distinguish that case from his. He argues that there is neither a "probative linkage" between the methamphetamine intoxication and the crime nor evidence showing the effect of methamphetamine use on him.

¶18    The officers testified at trial that they initially suspected McLaughlin was under the influence of methamphetamine because of his fidgeting and nervousness. Lewis acknowledged that people are generally nervous when pulled over by the police, but stated that McLaughlin's nervousness was different and that McLaughlin had a hard time standing still and was shaking. The officers' suspicion grew upon witnessing the extraordinary strength McLaughlin exhibited during the struggle. Officers testified that their suspicion about methamphetamine use increased their fear that McLaughlin would seriously injure them.

8

¶19    Dr. Gipe testified that a person can be behaviorally affected for six to twelve hours after taking methamphetamine and can test positively for the drug two to three days thereafter. He also testified that individuals under the influence of methamphetamine are "very agitated, they shift around a lot. We always call it 'tweaking' because they just can't sit still," and that the drug "has kind of an adrenalin-type effect." McLaughlin admitted that he had taken methamphetamine about six hours before the incident, but testified that the initial "rush" had subsided by the time of the incident.

¶20    McLaughlin's case is similar to *McCaslin*. Both cases involve evidence of the defendant's drug ingestion obtained after the completion of the crime which provided insight into the defendant's condition at the time the crime was committed. This evidence provides context to the criminal act, even though intoxication itself is not an element of the crime. In *McCaslin*, the evidence served to explain why the defendant would engage in the actions of taunting and fighting three men. Here, the evidence likewise provides context, tending to explain why the defendant would take the actions he took and why three trained officers would have a difficult time subduing him, including feeling the need to use pepper spray, submission holds, and baton strikes, and experience fear for their personal safety despite outnumbering him. Indeed, without it, the jury may well have wondered why three trained officers could not quickly subdue McLaughlin and why they claimed to have experienced fear of serious bodily injury from the smaller man. The evidence also came within the transaction rule for the same reasons as in *Buck*. It was relevant for the probative reasons described above, and "inextricably linked to, and explanatory of" the charged crime. *Gittens*, ¶ 37. While evidence of methamphetamine

9

use is not "without more, generally admissible," *Buck*, ¶ 81, here the evidence was vital to context, providing an explanation for McLaughlin's behavior which was out of the ordinary. It was not unduly prejudicial. While we have noted that "evidence of drug use is, by its very nature, prejudicial," *Buck*, ¶ 80, such evidence is inadmissible "only when its probative value is substantially outweighed by its unfair prejudicial effect." *State v. Southern*, 1999 MT 94, ¶ 66, 294 Mont. 225, 980 P.2d 3 (citation omitted). Here, the probative value outweighed the inherent prejudicial effect of the evidence. We conclude the District Court did not abuse its discretion in admitting the urine drug test results.

¶21 Additionally, McLaughlin argues that expert testimony and a *Daubert* hearing were necessary to establish a probative linkage between methamphetamine and McLaughlin's behavior, and that no foundation was established to qualify the officers as experts on the effect of the drug. The State responds that McLaughlin waived any argument concerning expert opinions and foundation by failing to raise these issues to the District Court. Alternatively, the State argues that a *Daubert* hearing is unnecessary because this case does not involve a novel scientific method.

¶22 Montana statutes state that "[f]ailure to make a timely objection during trial constitutes a waiver of the objection . . . ." Section 46-20-104(2), MCA. "The general rule in Montana is that this Court will not address either an issue raised for the first time on appeal or a party's change in legal theory." *Becker v. Rosebud Operating Servs., Inc.*, 2008 MT 285, ¶ 17, 345 Mont. 368, 191 P.3d 435. A motion in limine can preserve an issue for appeal, but a motion may fail to do so if it is not specific enough. *State v.*

*Weeks*, 270 Mont. 63, 85, 891 P.2d 477, 490 (1995); *State v. Vukasin*, 2003 MT 230, ¶ 29, 317 Mont. 204, 75 P.3d 1284.

¶23   In his motion in limine, McLaughlin stated "[f]urther, if the State is intending on offering testimony that certain drugs make persons act in certain ways, the Defense requests a Dauber [sic] Hearing on the matter."   Other than that single sentence, McLaughlin did not mention *Daubert*, foundation, or the rules concerning expert witnesses in his motion, at the pretrial hearing, or during the trial.   During the pre-trial hearing conducted to address motions, no mention of *Daubert* was made.   Perhaps because of the various issues raised by the defendant's motion in limine, the District Court carefully described what it understood it had been asked to decide at the hearing:

> All right.   So I'm going to make this record very clear. . . .   The second Motion before the Court is one asking the Court to rule in limine that any methamphetamine or marijuana that may have been in the Defendant's system at the time of the commission of these alleged offenses should be precluded *on the basis of relevancy*. . . .   So *the only issue* for the Court to decide is whether any evidence of methamphetamine or marijuana in the Defendant's system should be precluded *based upon relevancy.* [Emphasis added.]

On appeal, McLaughlin seeks to expand upon the single sentence request he made in the District Court, arguing that his motion in limine "comprised all the issues that both *Daubert* and the rules on expert testimony must deal with."

¶24   We disagree.   McLaughlin made a one sentence request for a *Daubert* hearing within a motion otherwise addressing relevancy and character evidentiary issues.   The hearing request was general and unsupported by authority or reasoning.   McLaughlin did nothing to draw the court's attention to the *Daubert* request after the District Court

11

carefully explained what it understood to be the nature of McLaughlin's request, or at any time later in the proceeding. We conclude that McLaughlin waived his *Daubert*-related arguments.

¶25 ***2. Did the District Court abuse its discretion by instructing the jury on intoxication?***

¶26 McLaughlin briefly argues that the District Court erred by instructing the jury that intoxication is not a defense because he did not raise an intoxication defense, and thus the only purpose of the instruction was to prejudice him before the jury.

¶27 The State responds that it had to prove the mental state of purposely and knowingly and, without the intoxication instruction from § 45-2-203, MCA, the jury may have improperly considered whether McLaughlin could have acted purposely or knowingly while on methamphetamine, and the instruction thus prevented the jury from making such a mistake in determining whether the requisite mental state was present.

¶28 We have held that a defendant does not necessarily have to raise intoxication as a defense in order for the intoxication instruction to be appropriate. *See State v. Strauss*, 2003 MT 195, ¶¶ 49-51, 317 Mont. 1, 74 P.3d 1052 (though intoxication not raised as a defense, defendant failed to show that giving intoxication instruction prejudiced her). McLaughlin's conclusory accusation of prejudice does not convince us that the District Court abused its broad discretion to instruct the jury on the applicable law for the case.

¶29 Affirmed.

/S/ JIM RICE

12

We concur:

/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS

Justice James C. Nelson, concurring.

¶30    I concur in the Opinion.  With respect to Issue 1 in particular, I agree with our analysis because the urine test results—which showed the presence of methamphetamine in McLaughlin's body at the time of his arrest—were evidence of "the fact in dispute" under the so-called "transaction rule," § 26-1-103, MCA.  They were evidence of matters that were "inextricably linked to *and* explanatory of" the charged offenses (assault and attempted assault with a weapon).  *See State v. Derbyshire*, 2009 MT 27, ¶ 31, 349 Mont. 114, 201 P.3d 811.  Specifically, under the facts of this case, the urine test results were inextricably linked to and explanatory of McLaughlin's resistance to arrest—i.e., the reasons he fought with the arresting officers and attempted to take control of their weapons and assault them—as well as the reasons the officers had difficulty subduing McLaughlin and feared for their personal safety despite outnumbering him.  Opinion, ¶ 20.  I agree with the Court that, on the record here, the admission of this evidence did not violate M. R. Evid. 404(b) and our jurisprudence under *State v. Just*, 184 Mont. 262,

13

602 P.2d 957 (1979), as modified in *State v. Matt*, 249 Mont. 136, 814 P.2d 52 (1991). The State's use of the urine test evidence in this case was an entirely proper application of the "transaction rule" and is a welcome retreat from the State's and this Court's ever-expanding interpretations of the transaction rule and § 26-1-103, MCA. *See State v. Crosley*, 2009 MT 126, ¶¶ 66-82, 350 Mont. 223, 206 P.3d 932 (Nelson & Cotter, JJ., specially concurring). It is probably too early to call this a trend, but I hope it is the direction in which we are heading.

¶31    I concur.

/S/ JAMES C. NELSON