DA 08-0561

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 69

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

DOUGLAS JAMES GUILL,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Sanders, Cause No. DC-06-54
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           William F. Hooks, Attorney at Law; Helena, Montana

           Michael J. Sherwood, Attorney at Law; Missoula, Montana

       For Appellee:

           Hon. Steve Bullock, Montana Attorney General; Jonathan M. Krauss,
Assistant Attorney General; Daniel Guzynski, Assistant Attorney General,
Special Deputy County Attorney for Sanders County;; Helena, Montana

           Coleen Magera, Sanders County Attorney; Thompson Falls, Montana

Submitted on Briefs:  February 17, 2010

Decided:  April 6, 2010

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Douglas Guill (Douglas) was convicted by a jury in the Twentieth Judicial District Court, Sanders County, of five counts of sexual misconduct against his daughter. Douglas appeals his conviction, arguing that the District Court committed reversible error by admitting testimony of uncharged misconduct. We affirm.

¶2 The sole issue on appeal is whether the District Court erred by allowing the prosecution to present evidence of uncharged misconduct.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The events giving rise to this case go back a short lifetime. From the evidence introduced at trial, the following facts are generally undisputed. Douglas met Candace Guill (Candace) in Boise, Idaho, on Christmas Eve 1972, and the two were married ten days later. In the first decade of their marriage, they drifted around the western states (mostly in the northern Rockies), scratching out a meager existence. In the early 1980s, Douglas became a born-again Christian. In 1984 the couple had their first child, Sarah Guill (Sarah). Two years later they had their second child, Jacob Guill (Jacob). The family continued its itinerant course, living at different times in Idaho, Wyoming, Oklahoma, and Montana. In 1991 they moved to Heron, Montana, and purchased property. At first they lived in a trailer house. Eventually, they built a house. They constructed the house in halves, creating front and back basements that were walled-off from each other.

¶4    While in Heron, Douglas, along with his friend Rick Christensen (Rick), started a successful business installing heating, ventilation, and air-conditioning (HVAC) systems. Candace homeschooled the children. In 1992 Douglas started a romantic relationship with Nicole Christensen (Nicole), Rick's sister, and brought her to the Guills' property in Heron to live with the family. Douglas and Candace did not divorce until 2006. In the interim, Candace moved to separate sleeping quarters, and Nicole became Douglas's new partner. After the house was built, Candace stayed in one half of the basement. The children's rooms were in the other half of the basement. The children worked on the property in Heron. As they grew older, they began to work for their father's business. Sarah and Jacob continued to live at home after they reached majority. On September 11, 2006, at the age of twenty-two, Sarah ran away.

¶5    On November 3, 2006, Sarah reported to the Sanders County Sheriff's Office that Douglas had been sexually assaulting her since she was a young child. Douglas was subsequently arrested, and the State filed an information charging him with two counts of sexual intercourse without consent, two counts of incest, and one count of sexual assault, all felonies. (An additional charge for misdemeanor sexual assault was dismissed.) The State's supporting affidavit alleged that Douglas began sexually assaulting Sarah when she was six and that he began having sexual intercourse with her when she was eight. After Nicole moved to the residence, the affidavit continued, she too became involved in the sexual abuse. The alleged abuse occurred daily until Sarah was seventeen (2001), and weekly from when Sarah was seventeen until she ran away at age twenty-two (2006).

3

Sarah had not told anyone of the abuse because Douglas had kept her isolated on their property in Heron, not allowing her to attend public school, travel off the property on her own, date boys, or access books other than the Bible and the homeschooling books she received through the eighth grade. Douglas controlled Sarah and forced her to submit to the abuse by telling her that he was God, that God told him to abuse her as he did, and that he determined who would go to heaven or hell. If Sarah told anyone about the abuse, Douglas threatened, she would go to hell, or he would kill himself, or he would harm Candace or Jacob.

¶6     The legal maneuvering that led to the introduction of the evidence now challenged on appeal began in the pretrial stages of this case. The State filed a notice pursuant to *State v. Just* (a "*Just* notice") that it intended to introduce evidence of "incidents of violence and religious control committed by Defendant Douglas James Guill against Sarah, Jacob and Candace Guill" other than the crimes with which Douglas had been charged. 184 Mont. 262, 602 P.2d 957 (1979), *modified*, *State v. Matt*, 249 Mont. 136, 814 P.2d 52 (1991), *and overruled in part on other grounds*, *State v. Swann*, 2007 MT 126, 337 Mont. 326, 160 P.3d 511. The notice claimed that such acts were "inseparably related to the crime[s] charged" and that the State would introduce evidence of such acts "to demonstrate the lack of consent as well as plan, common scheme or design to subject Sarah and Jacob Guill to repeated incidents of sexual abuse." Douglas objected to the *Just* notice, pointing out that the State had not specified what evidence it planned to present and arguing that the State could not introduce evidence of prior acts to show

4

Sarah's lack of consent since he had not raised a consent defense. Subsequently Douglas moved in limine to exclude "any offense, wrongs or acts of the Defendant for which he is not charged" on the basis of Rule 404(b) of the Montana Rules of Evidence.

¶7    The State, in turn, filed a response to Douglas's motion in limine and a notice of its intent to introduce evidence under the so-called transaction rule (§ 26-1-103, MCA). Pursuant to this rule, the State intended to introduce evidence "pertaining to Douglas Guill's . . . control of his children Sarah and Jacob and his wife Cand[a]ce through the use of religion and act[s] of physical and verbal abuse." Such evidence, the State claimed, was "inextricably linked" to the charged offenses and "tend[ed] to explain circumstances surrounding the charged offenses." Alternatively, the State repeated its position that this evidence was admissible under the "common scheme or plan" exception to Rule 404(b). The State then specified seven prior acts of physical and verbal abuse by Douglas against Sarah, Jacob, and Candace. Notably, the State did not signal any intention to introduce evidence of Douglas's control of Nicole.

¶8    The parties repeated their positions on this evidentiary dispute at a pretrial hearing on February 13, 2008. Douglas, through counsel, indicated that any acts of violence against anyone other than Sarah should be excluded under Rule 404(b) or Rule 403. The State conceded that acts of violence by Douglas against third parties, which Sarah was not aware of, would be not be admissible unless Douglas broached the subject on cross-examination (or "opened the door"). The District Court indicated that it would admit evidence of violence by Douglas against family members that Sarah was aware of and

5

exclude evidence of violence that Sarah was not aware of. In March the District Court issued a written order on the subject of evidence of other acts and the transaction rule. In its order, the District Court reasoned that evidence of violence by Douglas against family members would be admissible under the transaction rule:

> [E]vidence of the Defendant's alleged control of his family members, his religious beliefs as imposed on or required of his family members and any acts of physical or verbal abuse are "inextricably linked" to the allegations charged against the Defendant. This sort of transactional evidence is consistent, in the experience of the Court and case law, with the power/control dynamic inherent in sexual offenses.

The District Court further held that such evidence would also be admissible under the common plan or scheme exception to Rule 404(b).

¶9 The case went to trial. In its opening statement, the State presented its theory: that Douglas had continually sexually abused his daughter and that he was able to do so by isolating her and controlling her through religion, physical and verbal abuse, and threats of violence to himself and other family members. In his opening statement, Douglas, through counsel, categorically denied sexually abusing Sarah and suggested that Candace and Sarah, the State's principal witnesses, had invented the allegations to get at Douglas's money and property, which he had earlier decided to bequeath to Nicole. Candace's motivation to lie, the defense suggested, was that she was facing an imminent divorce (due to her prior infidelity) that would leave her destitute.

¶10 It was, Douglas submits, during the following evidentiary phase of the trial that the District Court erroneously allowed the State to introduce evidence of prior bad acts. Candace, the State's first witness, testified to her history with Douglas: their marriage

and peregrinations, his becoming born-again, the birth of their children, their financial hardship, and his role as the family's sole decision-maker. At one point during direct examination, the State asked Candace if she had ever tried to assert herself against Douglas. Douglas objected that allowing Candace to testify to acts of violence by Douglas that Sarah was not aware of violated the District Court's ruling on his motion in limine. The State countered that Douglas had opened the door to such testimony in his opening statement by mentioning Candace's infidelity and suggesting that Candace had a motive to testify untruthfully—consequently, the State argued, it should be able to "tell the whole story" about the spouses' relationship. Recognizing that the case was "going to turn on the credibility of the various witnesses," the District Court agreed with the State, but gave a limiting instruction to the jury that evidence of violence by Douglas against Candace should be considered only "to show that the defendant caused fear in Candace Guill." Candace then testified that Douglas had choked her when she had tried to assert herself against him: "It took place in Stillwater, Oklahoma in a camp trailer."

¶11 The State subsequently elicited testimony from Candace about other occasions when Douglas had been violent toward her. Candace related that during a family camping trip in northern Montana, Douglas became angry with her and struck her repeatedly in the leg, causing bruising. On another occasion, when Douglas, Nicole, Sarah, and Candace were in the hot tub on the property in Heron, Douglas ordered Candace to get out of the hot tub and lie on their deck in the snow for nearly an hour. Douglas did not object to Candace's recounting of either event. Candace also testified,

over objection, that Douglas had once made her place her hand on a counter and then flogged her hand with a wooden spoon, causing pain, swelling, and bruising. After this testimony, the District Court gave another limiting instruction that Candace's testimony "goes to the relationship between the parties and [should be considered] for no other reason." Candace also testified that after Douglas learned that Candace had helped Sarah run away, Douglas told Candace, "I could hit you in the face, you'd fall on your head and hit the concrete and you'd be dead and I'd be innocent." In the aftermath of Sarah's departure, Candace continued, Douglas made her draft letters in which she wrote that Sarah might accuse Douglas of sexual abuse and that Douglas was innocent of any wrongdoing.

¶12  Candace further testified, without objection, about peculiar aspects of Douglas's religious beliefs: "He felt God was telling him where to move. And that's where we would move next. He basically told me, he says, God's the head of man, man's the head of woman, and woman's to do whatever he says whether it be right or wrong." She also testified (again, without objection) to having sex with Rick Christensen because Douglas commanded her to.

¶13  Sarah, the State's second witness, testified to fourteen years of sexual abuse by Douglas. She testified about her isolation, not being permitted to attend public school or have friends for the years she lived in Heron. She testified about how Douglas would use fear, his religious beliefs, and threats of violence to himself (and threats of eternal damnation to others) to make Sarah submit to his sexual abuse. Sarah also testified,

8

without objection, to one occasion when Douglas caught Jacob talking to a youth who was working next door: "He picked him up by the shirt and he threw him into the ground, and he says why are you talking to people. And he was mad. And then he just turned around and left." The District Court immediately interjected with a limiting instruction for the jury, informing the jurors only to consider this evidence "to show that there was fear caused in the family members." Sarah's testimony also corroborated some of Candace's testimony. Sarah remembered Douglas's striking Candace in the leg on the camping trip and his commanding Candace to lie in the snow. She further testified that while she did not witness Douglas striking Candace on the hand with the spoon, she did see Candace's bruised and swollen hand afterwards.

¶14     The State went on to present numerous witnesses, including Ed Cain and Clifford Phillips. On appeal, Douglas claims that the District Court erroneously admitted testimony by Cain and Clifford that violated Rule 404(b). Cain, a pastor from Spokane, Washington, who had known the Guills in Montana during the 1980s, testified to a dinner that he attended at the Guills' property in Heron in 1997. It was, in Cain's words, "the most bizarre meal I've ever eaten." Nicole sat next to Douglas and spoon-fed him the meal. The children, Sarah and Jacob, seemed intimidated, afraid, and embarrassed. After dinner Douglas

> had Nicole go back to a room and change outfits and come back into the living room area there where we were sitting with some type of a negligee of some sort, to model that before me. . . . [S]he came out, she modeled this little negligee. And as I recall, she left and put on her normal clothes and came back out and sat at Doug's feet.

Douglas objected to this entire line of questioning. Cain also testified that later during the same visit Douglas told Cain that God had told him (Douglas) that Cain should not visit Cain's children who lived nearby in Troy, Montana, and that Cain should stay with the Guills in Heron. Douglas did not object to this testimony.

¶15 Phillips, a carpenter who now lives in Washington, testified to a similar dinner experience that he had at the Guills' house, also in 1997. In Phillips's words, the incident was "very, very odd to me, very strange." Over objection, Phillips testified that during dinner Candace and Nicole sat next to Douglas and fed him: "He never touched the plate. And I was really freaked out about that. He didn't pick up a fork, he didn't touch the plate, nothing. And they would take the food and they would feed it to him catching any crumb or morsel, both of them, you know, from both sides." The children, Phillips attested, did not speak or interact, but were "very well behaved, as if they were living in fear." At one point, Phillips continued, one of the children spilled milk, which seemed to enrage Douglas: "[H]e was—expressed extreme restraint to not just react like he might react if I hadn't been there." Douglas uttered some harsh words, and Candace "whisked" the children away. After this testimony, the District Court gave a limiting instruction that the jurors should only consider this information "with regard to the concerns for fear and control" and "with regard to the relationships in this family."

¶16 Phillips further testified to Douglas's cigarette smoking habits:

> It was pretty freaky. I use the word freaky loosely. It really causes you to really wonder about a man and a woman when Nicole would stand there turning purple—I kid you not—turning purple in a pair of short shorts and a little thin T-shirt catching his ashes from his cigarette in the driveway

10

> outside, catching his ashes from his cigarette in her hand, standing right next to him catching them as he continuously—this happened all the time.

Douglas objected that this testimony was irrelevant. Next, over Douglas's hearsay objection, Phillips testified to Douglas's confiding that he "was one of God's chosen people, chosen to be a leader." Without objection, Phillips then testified that Douglas advised him to leave his wife and move to the Guills' property with his children. "It was," Phillips summarized, "as if he was trying to recruit me to some kind of a cult or something that he was trying to start."

¶17 The State went on to call various lay and expert witnesses, as did Douglas. The parties presented conflicting evidence about a vaginal injury that Sarah had suffered. Douglas presented testimony suggesting that the injury was not caused by Douglas, but by Sarah's boyfriend after she ran away. Nicole testified, denying that she or Douglas sexually abused Sarah or that Douglas had been violent toward other members of the family. Douglas testified in his own defense, also denying that he sexually abused Sarah or was violent toward other members of the family. Both Nicole and Douglas described a normal and content family. Douglas denied that after Sarah ran away, he forced Candace to write letters exculpating him from sexually abusing Sarah.

¶18 The parties presented closing arguments, repeating their theories of the case. The State argued that Douglas sexually abused Sarah for most of her life and that he accomplished this by isolating his family and using religion and violence to create an environment of fear and control. Douglas argued that the State had not met its burden of proof, he pointed out inconsistencies in the testimony of the State's witnesses

11

(particularly Sarah), and he suggested that Candace and Sarah had pecuniary motives for contriving their allegations.

¶19 After nearly ten hours of deliberation over two days, the jury returned a verdict, finding Douglas guilty on all counts. The District Court sentenced Douglas to fifty years imprisonment for each count, to run concurrently, without the possibility of parole. The District Court further imposed restitution and court costs, designated Douglas as a Tier III sex offender and sexually violent predator, and recommended conditions if Douglas is ever paroled.

¶20 Douglas appealed.

## STANDARD OF REVIEW

¶21 Generally we review a district court's decision to admit or exclude evidence for abuse of discretion, and we uphold the decision unless it "exceeds the bounds of reason." *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811 (explaining that a district court abuses its discretion if "it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice"). However, where a district court's rationale for admitting or excluding evidence is based on a conclusion of law, we review the conclusion of law de novo, according no measure of deference to the district court. *Id.*

**DISCUSSION**

¶22 *Whether the District Court erroneously allowed the prosecution to present evidence of uncharged misconduct by Douglas.*

¶23 Douglas contends that the District Court committed reversible error by admitting evidence of uncharged misconduct and bizarre behavior. Douglas argues that the District Court admitted this evidence, which should have been excluded under Rule 404(b) by erroneously applying the transaction rule (§ 26-1-103, MCA). The State counters first that the Court should dismiss Douglas's appeal because Douglas's brief does not comply with Rule 12(1)(f) of the Montana Rules of Appellate Procedure. Second, the State argues that evidence admitted of Douglas's actions toward other members of the family was properly admitted under the transaction rule.

¶24 Initially, the State argues that we should dismiss Douglas's appeal because it is inadequately briefed, in that the argument section of the brief contains no citations to the record. An appellant's opening brief must contain an argument section, and the argument section must contain "the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes, and pages of the record relied on." M. R. App. P. 12(1)(f). Here, the State directs us to two cases, *State v. Longfellow*, 2008 MT 343, ¶ 18, 346 Mont. 286, 194 P.3d 694, and *State v. Cybulski*, 2009 MT 70, ¶¶ 13-15, 349 Mont. 429, 204 P.3d 7, that reaffirm this Court's policy not to consider arguments that are unsupported by citations to *legal authority*. However, because neither *Longfellow* nor *Cybulski* involved the situation presently

13

before the Court (where an appellant fails to include citations to *the record* in the argument section of the opening brief), they are of minimal relevance. Contrary to the State's position, we conclude that while the argument section of Douglas's opening brief does not cite to the record, the fact section does. Douglas's brief is sufficiently comprehensible to allow review on the merits.

¶25    Douglas fashions his appeal as a challenge to the District Court's *interpretation* of the transaction rule (§ 26-1-103, MCA) and a challenge to the District Court's *application* of the transaction rule. Accordingly, we first review the interpretation of the rule (de novo) and second, its application (for abuse of discretion). The text of the transaction rule, § 26-1-103, MCA, reads: "Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." Douglas suggests that the District Court, in its ruling on Douglas's motion in limine, incorrectly interpreted the transaction rule as allowing admission of evidence that is "inextricably linked" to the allegations charged. Citing *State v. Derbyshire*, 2009 MT 27, ¶¶ 32-33, 349 Mont. 114, 201 P.3d 811, and *State v. Hansen*, 1999 MT 253, ¶ 96, 296 Mont. 282, 989 P.3d 388, Douglas contends that this formulation of the transaction rule is an erroneous remnant of the discredited doctrines of *res gestae* and *corpus delicti*.

¶26    We conclude that the District Court did not err in employing the "inextricably linked" formulation of the transaction rule. In *Hansen* we abandoned the terms *res gestae* and *corpus delicti*, which, like magic incantations, had been invoked by courts and

14

parties alike to introduce and admit evidence of questionable value without subjecting it to critical analysis. *Hansen*, ¶¶ 35, 72-84, 96. Additionally, we have endeavored to cabin application of the transaction rule to prevent it from overthrowing the Rule 404(b) exclusion of other-bad-acts evidence. *See State v. Berosik*, 2009 MT 260, ¶ 46, 352 Mont. 16, 214 P.3d 776 (cautioning that the transaction rule should not be permitted to admit propensity evidence that would otherwise be excluded by Rule 404(b)); *Derbyshire*, ¶ 28-40 (finding that generalized background information that is not relevant to a disputed fact may not be admitted under the transaction rule); *State v. Detonancour*, 2001 MT 213, ¶¶ 29-31, 306 Mont. 389, 34 P.3d 487 (acknowledging that evidence that may be admissible under the transaction rule is still subject to fact-specific balancing under Rule 403).

¶27 Still, since *Hansen*, we have continued to employ the phrase "inextricably linked" to describe acts that are part of a transaction under § 26-1-103, MCA. *E.g. State v. Lacey*, 2010 MT 6, ¶ 31, 355 Mont. 31, ___ P.3d ___; *State v. McLaughlin*, 2009 MT 211, ¶ 14, 351 Mont. 282, 210 P.3d 694; *State v. MacKrill*, 2008 MT 297, ¶ 41, 345 Mont. 469, 191 P.3d 451. The rationale for admitting transaction evidence is, first, that it is theoretically difficult to subdivide a course of conduct into discrete criminal acts and "other" conduct and, second, practically speaking it is difficult for a witness to testify coherently to an event if the witness is only permitted to reference the minutely defined elements of the crime. Charles Alan Wright & Kenneth W. Graham, Jr., *Federal*

*Practice and Procedure: Evidence* vol. 22, § 5239, 446 (West 1988); *see also Berosik*, ¶ 45 (recognizing similar rationale for admitting evidence under the transaction rule).

¶28    All federal circuits, as well as numerous commentators, recognize the legitimacy of admitting properly limited evidence that is "intrinsic to" or "inextricably intertwined with" a charged crime.  Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* vol. 2, § 404.20[2][b]-[c], 404-43 to 404-46.2 (Joseph M. McLaughlin ed., 2d. ed., Matthew Bender 2010) (noting that all circuits have adopted general rule); *see also e.g.* David P. Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 5.2, 330 (Richard D. Friedman ed., Aspen Publishers 2009); Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* vol. 1, § 4:33, 808-18 (3d ed., Thompson West 2007); George Dix et al., *McCormick on Evidence* vol. 1, § 190, 754 (Kenneth S. Broun ed., 6th ed., Thompson West 2006); Christopher B. Mueller & Laird C. Kirkpatrick, *Modern Evidence* § 4.23, 368-69 (Little, Brown & Co. 1995); Wright & Graham, *Federal Practice and Procedure: Evidence* at vol. 22, § 5239, 448-49.

¶29    In light of this confluence of our recent jurisprudence, practicality, and persuasive authority, we conclude that the District Court did not erroneously interpret the transaction rule.[1]   We now turn to Douglas's challenge to the District Court's application of the transaction rule.

---

[1] Douglas also quibbles that the District Court erroneously interpreted the transaction rule "as a general rule of admissibility" rather than "an exception to a general rule of exclusion."  This argument creates a distinction without a difference: an evidentiary rule that is an exception to an exclusion is, effectively, a general rule of admissibility.

¶30    In addressing application of the transaction rule to the case at hand, it must be borne in mind that the "transaction" at issue is both temporally and factually broad—repeated sexual abuse of Sarah over a period of some fourteen years. Given that this abuse occurred in a extremely controlled and isolated "home" environment with the cooperation of other adults who remained silent, the range of facts which were "inextricably intertwined with and explanatory of" the atmosphere of abuse, oppression, and silence is, of necessity, uniquely broad.

¶31    For the purpose of analysis, the challenged evidence can be divided into two general groupings: acts of which Sarah was aware and acts of which Sarah was not aware. We first consider the evidence of acts of which Sarah was aware. This grouping includes testimony by Candace that Douglas struck her in the leg during a camping trip, made her get out of their hot tub and lie in the snow, struck her hand with a wooden spoon,[2] and isolated Sarah and Jacob by homeschooling them, limiting their travel, and not allowing them to have friends. It also includes testimony by Sarah that Douglas grabbed and threw Jacob for talking with another youth. Last, it encompasses testimony by Ed Cain and Clifford Phillips about their observations during those portions of their dinner experiences at which Sarah was present.

¶32    Initially we carve out the testimony that Douglas isolated Sarah and Jacob by homeschooling them, limiting their travel, and not allowing them to have friends. Douglas did not object to this evidence in his motion in limine or at trial. As a result, he

---

[2] While Sarah did not witness Douglas strike Candace's hand with the spoon, she testified that she was aware of the event and that she saw Candace's injured hand afterwards.

waived his right to claim error on appeal. *In re Bower*, 2010 MT 19, ¶ 20, 355 Mont. 108, ___ P.3d ___ ("Failure to make a timely objection constitutes waiver of the right to claim error on appeal."). Furthermore, Douglas does not argue that admission of this evidence was plain error. *See State v. Earl*, 2003 MT 158, ¶ 25, 316 Mont. 263, 71 P.3d 1201 (explaining plain error review). Accordingly, we decline to address Douglas's argument with regard to this evidence.

¶33 Next, we conclude that the District Court did not abuse its discretion in admitting evidence, pursuant to the transaction rule, of individual acts of violence by Douglas against Candace and Jacob that Sarah was aware of. As mentioned above, the transaction rule, § 26-1-103, MCA, provides: "Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." The fact in dispute in a criminal case is whether the defendant committed all the elements of the charged offense. *Derbyshire*, ¶ 29.

¶34 Here, the State prosecuted Douglas for sexually abusing Sarah for a period of fourteen years, from the age of eight until she was twenty-two. One charge was sexual intercourse without consent for the period from June 2000, when Sarah turned sixteen, to September 2006, when she ran away at age twenty-two. Douglas argues that consent was not at issue because he never presented a consent defense, but instead denied ever having sexual intercourse with Sarah. We disagree. Lack of consent of the victim is a necessary element of sexual intercourse *without consent.* Section 45-5-503, MCA. In order to

18

secure a conviction, the State had to prove that Douglas had sexual intercourse, with Sarah, without her consent. *See State v. LaMere*, 2003 MT 49, ¶ 16, 314 Mont. 326, 67 P.3d 192 ("It is well established that when the State charges an offense, the State assumes the burden of proving each and every element of the offense."). The testimony of Douglas's prior violence against Candace and Jacob that Sarah was aware of—Douglas's striking Candace's leg and hand, and throwing Jacob—was evidence of a fact in dispute: whether Douglas's sexual intercourse with Sarah was consensual. From this testimony, one could infer that the violent acts against family members inspired fear in Sarah and, consequently, that Sarah did not consent to sexual intercourse with Douglas, but submitted out of fear. *See* Edward J. Imwinkelried, *Uncharged Misconduct Evidence* vol. 1, §§ 6:03, 6:09, 6-4 to -5, 6-18 to -19 (West 1998) (stating that prior acts of violence against others may be admissible to prove fear and, consequently, lack of consent). We conclude that the District Court did not abuse its discretion in admitting evidence of violence against family members of which Sarah was aware.

¶35 Similarly, Cain's and Phillips's testimony about their dinner experiences at the Guills' house (that Sarah did not speak during dinner and seemed intimidated and fearful and that Douglas acted infuriated when one of the children spilled milk) was circumstantial evidence that bolstered Sarah's testimony and the State's theory that over the course of fourteen years Sarah submitted to sexual intercourse with Douglas, her father, because she was afraid and manipulated. This was evidence of a fact in dispute

19

(lack of consent), and the District Court did not abuse its discretion in allowing such testimony under the transaction rule.

¶36 Douglas also contends that the District Court erred in allowing Cain and Phillips to testify that Nicole and Candace fed Douglas during dinner. We disagree and conclude that the District Court appropriately allowed this information, which was "inextricably linked to and explanatory of" Sarah's silence and apparent fright during the dinner. *Derbyshire*, ¶ 41. Evidence that is inextricably linked to and explanatory of a fact in dispute may be admitted under the transaction rule in order to provide a comprehensive and complete picture of the commission of a crime. *State v. Bauer*, 2002 MT 7, ¶ 23, 308 Mont. 99, 39 P.3d 689 (upholding admission of evidence under transaction rule "to understand the context of the alleged incest"); *cf. Derbyshire*, ¶¶ 39-41 (concluding that collateral evidence was unnecessary to establish context of alleged crime and that district court erred in admitting such evidence under the transaction rule). (Such evidence, however, may still be excluded, upon proper objection, if it is only relevant to create an impermissible propensity inference, *Barosik*, ¶ 46, or is unduly prejudicial under Rule 403, *Detonancour*, ¶¶ 30-32.) Further, courts must be cognizant of each party's need to present the "evidentiary richness" and "narrative integrity" of its case. *Old Chief v. United States*, 519 U.S. 172, 183, 117 S. Ct. 644, 651 (1997); *see also United States v. Morgan*, 354 F.3d 621, 623 (7th Cir. 2003) ("A tale bereft of narrative is hard either to follow or to credit."). Here, Cain's and Phillips's descriptions of Candace and Nicole feeding Douglas were inextricably linked to and explanatory of Douglas's control of

20

Sarah and his family and depicted a comprehensive scene in which the guests attributed Sarah's reticence to her fear of her father. In this case where Douglas's alleged sexual abuse was continuous (daily, then weekly) over a period of fourteen years, Sarah's observation of Candace's and Nicole's self-effacing obedience to Douglas is evidence of a fact in dispute: whether Sarah's submission to Douglas's sexual abuse was consensual. Thus we conclude that the District Court did not error in admitting Cain's and Phillips's testimony about those events which occurred during dinner while Sarah was present. We next turn to the other bad acts of which Sarah was not aware.

¶37 The second grouping of challenged evidence comprises acts of violence toward family members other than Sarah, and of which Sarah was not aware. This grouping includes evidence of four acts: Douglas choking Candace in Oklahoma; Douglas threatening to hit Candace in the head and cause her death; Nicole catching Douglas's cigarette ash in her hands while scantily clad and outside in the cold; and Nicole modeling undergarments for Douglas and Cain. We will address these various acts in turn.

¶38 Candace testified that when the family was living in Stillwater, Oklahoma, she tried to assert herself against Douglas and that Douglas responded by choking her for "a minute or two." No evidence indicates that Sarah was aware of this event. Prior to Candace giving this testimony, Douglas objected that since Sarah did not know about this event, it should be excluded under Rule 404(b), and further that it was not admissible under the transaction rule. The State countered that Douglas had opened the door to this

21

testimony when he brought up Candace's infidelity in his opening statement. The Court agreed with the State that Douglas had opened the door by mentioning Candace's infidelity and suggesting that Candace was biased against Douglas because she feared that Douglas would divorce her and leave her with nothing. The District Court limited the State to describing minimal details of the event and gave the jury a limiting instruction.

¶39 We conclude that the District Court did not abuse its discretion in permitting this testimony. When one party opens the door, or broaches a certain topic that would otherwise be off limits, "the opposing party has the right to offer evidence in rebuttal, including evidence of other acts." *State v. Veis*, 1998 MT 162, ¶ 18, 289 Mont. 450, 962 P.2d 1153. A party may open the door to a given subject during its opening statement. *State v. Atlas*, 224 Mont. 92, 99-101, 728 P.2d 421, 425-26 (1986). A party may rebut an allegation of bias by offering testimony to explain the initial suggestion or correct a false impression given by the other party. *United States v. Akitoye*, 923 F.2d 221, 225 (1st Cir. 1991); *United States v. Martinez*, 775 F.2d 31, 37-38 (2d Cir. 1985). District courts have broad discretion to determine the extent to which a party may respond once the other party opens the door. *Veis*, ¶ 19.

¶40 Here, Douglas suggested in his opening statement that Candace was an unfaithful wife who "orchestrated" Sarah's departure and was instrumental in fabricating the allegations against Douglas for monetary purposes. Douglas also suggested that he was considerate enough of the children and kind enough to Candace to support her and allow

22

her to remain with him until the children reached majority. By raising the issue of Candace's credibility or bias, Douglas opened the door to the State's presenting evidence to explain the relationship between Douglas and Candace and to correct the impression that Candace was an aggressive, calculating woman, intent on acquiring Douglas's wealth. The District Court did not abandon reason but acted within its proper discretion by allowing this testimony.

¶41    Candace also testified that after Sarah ran away, Douglas told her, "I could hit you in the face, you'd fall on your head and hit the concrete and you'd be dead and I'd be innocent." Douglas objected that this testimony violated Rule 404(b). The District Court overruled the objection.

¶42    We conclude that the District Court did not abuse its discretion in allowing this evidence. The transaction rule may apply to events that occur subsequent to the commission of a crime. *State v. McCaslin*, 2004 MT 212, ¶¶ 33-34, 322 Mont. 350, 96 P.3d 722. Here, Candace's testimony that Douglas threatened her was used to support Candace's statement that, after Sarah left, Douglas forced Candace to write a letter attesting that he was innocent of sexually abusing Sarah. If Douglas did in fact force Candace to compose this letter, the implication is that he did so out of concern that Sarah would truthfully allege that he had sexually assaulted her. This testimony was inextricably linked to and explanatory of a fact in dispute: whether Douglas had sexual intercourse with Sarah. It is thus within the transaction rule, and the District Court did not abuse its discretion in admitting this testimony. *See State v. Marshall*, 2007 MT 198,

23

¶¶ 20-21, 338 Mont. 395, 165 P.3d 1129 (allowing evidence that was not itself the fact in dispute, but "evidence of the fact in dispute").

¶43 Next, Phillips testified about Nicole catching the ash from Douglas's cigarettes in her hands. Douglas now contends that this testimony violated Rule 404(b). However, at trial Douglas objected to this testimony on the basis of relevance only. A party may not change legal theories on appeal. *State v. Weaselboy*, 1999 MT 274, ¶ 16, 296 Mont. 503, 989 P.2d 836. Douglas does not argue that the District Court's admission of this testimony was plain error. Consequently, we decline to address Douglas's challenge to this evidence on appeal.

¶44 Finally, Cain testified that after his dinner with the Guills in 1997, Sarah, Jacob, and Candace left, and then Nicole changed into and modeled a negligee for him and Douglas. There was no testimony that Sarah was present when this happened. Douglas objected to this testimony on the basis of Rule 404(b). The District Court overruled the objection and permitted the testimony without giving a limiting instruction.

¶45 While the admission of this evidence was a close call, we conclude that the District Court did not abuse its discretion. The transaction rule is most legitimately used to admit uncharged misconduct when such conduct arises from a continuing series of events:

> If a person is charged with engaging in a continuing criminal enterprise or other crime that occurs over a period of time rather than on a discrete occasion or occasions, conduct committed in furtherance of the event that occurred during the period of the alleged criminal enterprise is part of the charged conduct itself, not "uncharged misconduct."

24

Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* at § 5.3.1, 330, 333. Here, Douglas's alleged sexual abuse of Sarah occurred over a period of fourteen years. This abuse occurred within the context of Douglas's tightly controlled and isolated family. Candace testified, without objection from Douglas, that he was of the religious belief that "[m]an's the head of woman, and woman's to do whatever he says whether it be right or wrong." The incident in which Nicole, at the command of Douglas, modeled the negligee for a stranger is entirely in keeping with his self-proclaimed "God-given" right to dominate the women of the household. It is evidence of his ability to command all the women of the household (Sarah included) to submit to demeaning, nonconsensual acts. Thus, we conclude that this evidence was inextricably linked to and explanatory of the ongoing abuse of Sarah, with which Douglas was charged. The District Court did not abuse its discretion in allowing this testimony as part of the transaction at issue.

¶46     Douglas cites our recent decision, *State v. Lacey*, 2010 MT 6, 335 Mont. 31, ___ P.3d ___. In *Lacey*, the defendant was charged with sexual intercourse without consent for two discrete assaults on the victim. *Id.* at ¶¶ 6, 32. In that case, the district court admitted evidence under the transaction rule that the defendant had made sexual advances toward others. *Id.* at ¶ 9. We reversed on appeal, concluding that the evidence of other acts was "completely separate from the sexual encounters for which [the defendant] was charged" and that the evidence served only to support an improper propensity inference

(that because the defendant was a lecherous man, he likely raped the victim). *Id.* at ¶¶ 32-33.

¶47 *Lacey* is distinguishable from the present case. Unlike this case, *Lacey* did not involve a continuing criminal enterprise, but instead specific acts of violence against the victim. *Lacey* did not involve acts of violence committed within a tightly knit household in which all other family members were either subject to abuse or complicit in the criminal enterprise. Finally, unlike *Lacey*, the specific act at issue here, Douglas's commanding Nicole to model undergarments for a guest, involved the other participant in the sexual abuse of Sarah.

¶48 For the foregoing reasons, we affirm the judgment of the District Court.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ JIM RICE
/S/ JAMES C. NELSON

Justice James C. Nelson, concurring.

¶49 I join the Court's well-reasoned Opinion. I remain highly critical of the use, at all, of the transaction rule in criminal cases, however.

¶50 As noted, the transaction rule is codified at § 26-1-103, MCA. *See* Opinion, ¶ 7; *State v. Gaither*, 2009 MT 391, ¶ 41, 353 Mont. 344, 220 P.3d 640; *State v. McLaughlin*,

2009 MT 211, ¶ 14, 351 Mont. 282, 210 P.3d 694; *State v. Derbyshire*, 2009 MT 27, ¶¶ 31-33, 349 Mont. 114, 201 P.3d 811. This statute is truly an historical artifact—one which, it should be noted, originally applied in *civil* litigation, not *criminal* prosecutions. It came straight out of David Dudley Field's *The Code of Civil Procedure of the State of New-York*, Part IV (published in 1850), where it was denominated § 1683 and stated: "Where also the declaration, act or omission, forms part of a transaction, which is itself the fact in dispute, or evidence of that fact, such declaration, act or omission, is evidence, as part of the transaction." Given the subsequent adoption of the Montana Rules of Evidence in 1976, this archaic statute arguably should be consigned to the dustbin of history. However, because it is still on the books, this Court must give § 26-1-103, MCA, whatever limited meaning it deserves, keeping in mind the spirit, intent, and specific constraints of M. R. Evid. 404(b) and the Modified *Just* Rule (*see State v. Just*, 184 Mont. 262, 269, 274, 602 P.2d 957, 961, 963-64 (1979), *modified*, *State v. Matt*, 249 Mont. 136, 142-43, 814 P.2d 52, 56 (1991)).

¶51 The problem is that it is much easier for prosecutors and trial courts to shotgun evidence into a trial under the transaction rule than it is to comply with the exacting substantive and procedural requirements of M. R. Evid. 404(b) and the Modified *Just* Rule. The latter approach protects the accused's fundamental due process right to be convicted based solely on the evidence of the crime allegedly committed, while the former approach—the path of least resistance—encourages the jury to convict on the improper basis of supposition regarding the accused's character and propensity for

criminal conduct. *See United States v. Foskey*, 636 F.2d 517, 523 (D.C. Cir. 1980) ("It is fundamental to American jurisprudence that a defendant must be tried for what he did, not for who he is. That precept is . . . a concomitant of the presumption of innocence." (citation, alteration, and internal quotation marks omitted)); *Old Chief v. United States*, 519 U.S. 172, 180-81, 117 S. Ct. 644, 650-51 (1997) (the prosecution may not use evidence of a defendant's bad character or disposition to establish a probability of his guilt; the risk of propensity evidence is that the jury will convict for crimes other than those charged or that, uncertain of guilt, the jury will convict anyway because a bad person deserves punishment); *Derbyshire*, ¶ 22 (one of the dangers in admitting evidence of uncharged misconduct is that the jury will prejudge the defendant and deny him a fair opportunity to defend against the charge or will convict him on the rationale that he has a defect of character that makes him more likely to have committed the charged offense).

¶52 The transaction rule cannot be used as a free pass around the Modified *Just* Rule or as a generic safety net for otherwise inadmissible evidence. As we have noted before, § 26-1-103, MCA, does not admit character evidence excluded by M. R. Evid. 404(b), *see State v. Berosik*, 2009 MT 260, ¶ 45, 352 Mont. 16, 214 P.3d 776, and evidence that satisfies § 26-1-103, MCA, is still subject to exclusion under M. R. Evid. 403, *see State v. Detonancour*, 2001 MT 213, ¶¶ 29-31, 306 Mont. 389, 34 P.3d 487. Indiscriminate use of the transaction rule will easily swallow these safeguards and the prohibition on using bad character or relying on a propensity inference to convict the defendant. *See Berosik*, ¶ 46; *State v. Crosley*, 2009 MT 126, ¶¶ 66-75, 350 Mont. 223, 206 P.3d 932 (Nelson &

28

Cotter, JJ., specially concurring).  But unfortunately, "[t]he path of least resistance and least trouble is a mental rut already made.  It requires troublesome work to undertake the alteration of old beliefs."[1]  To that end, the Court today provides trial courts and practitioners with important guidance on the admission of transaction-rule evidence.

¶53    With respect to the "inextricably linked" standard that we and other courts use for admitting such evidence, I note here that "inextricable" is defined as "incapable of being disentangled or untied."  *Merriam-Webster's Collegiate Dictionary* 597 (10th ed., Merriam-Webster 1997); *cf. Callahan v. Chicago, Burlington & Quincy R.R. Co.*, 47 Mont. 401, 410, 133 P. 687, 689 (1913) (the declaration, act, or omission must be "so connected with the main transaction as to form a part of it").  Thus, it may be useful to view § 26-1-103, MCA, and M. R. Evid. 404(b) as applying to mutually exclusive categories of evidence:  the latter, by its terms, concerns "other" crimes, wrongs, or acts, while the former concerns crimes, wrongs, or acts that are "incapable of being disentangled or untied" from a fact in dispute and, thus, are not "other" crimes, wrongs, or acts.  *See e.g. United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000) (evidence offered as "direct evidence of the fact in issue," and evidence of uncharged acts performed contemporaneously with the charged crime to facilitate its commission, are not "other" crimes, wrongs, or acts); Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence* vol. 22, § 5239, 448 (West 1978) ("[I]t can be said that a crime that is so interwoven with the charged crime that it is impossible to

---

[1] John Dewey, *Essays and* How We Think, in *The Later Works* 1925-1953 vol. 8 (1933), 136 (Jo Ann Boydston ed., S. Ill. U. Press 2008).

prove one without revealing the other is not an 'other' crime, wrong, or act within the meaning of the rule."); Christopher B. Mueller & Laird C. Kirkpatrick, *Modern Evidence* § 4.20, 342 (Little, Brown and Co. 1995) ("While [Rule 404(b)] is probably inapplicable to acts necessarily included in the charged offense, its standards and safeguards do apply to crimes more loosely connected to the charged offense and offered to provide background and context.").

¶54 Lastly, given the potential for misuse of transaction-rule evidence, I would require that if evidence is deemed admissible under § 26-1-103, MCA, and is not excluded under M. R. Evid. 403, then an appropriate limiting instruction must be given (if requested) so as to reduce the possibility that the jury might use the evidence as impermissible propensity or character evidence. *See e.g. Matt*, 249 Mont. at 142-43, 814 P.2d at 56 (the jury must be told the purpose of the evidence and must be admonished to weigh the evidence for that purpose only and not to convict the defendant for uncharged misconduct or based on the forbidden propensity inference). That is essentially what the District Court did in this case.

¶55 With these observations, I concur in the Court's Opinion.


/S/ JAMES C. NELSON

30